IN RE the MARRIAGE OF: Elizabeth A. LANGE, Petitioner-Respondent,

v.

Robert P. LANGE, Respondent-Appellant.†

Court of Appeals

*No. 91-0133. Submitted on briefs February 5, 1992.—Decided March 18, 1993.*

(Also reported in — N.W.2d —.)

†Petition to review filed.

375

For the respondent-appellant the cause was submitted on the brief of *Richard D. Martin* of Milwaukee.

For the petitioner-respondent the cause was submitted on the brief of *Bradley A. Kennedy* of *Krueger, Tlusty, Hittner & Kennedy, S.C.* of Schofield.

Before Gartzke, P.J., Dykman and Sundby, JJ.

GARTZKE, P.J. Robert Lange appeals from the judgment divorcing him from Elizabeth Lange. The judgment awards to her the legal custody and primary physical placement of the parties' three minor children and further provides,

> The respondent [Robert] is awarded reasonable visitation supervised by a proper person approved by the Clark County Department of Social Services. . .. At such time as it is shown that [Robert's] visitation can

occur without him imposing his fundamentalist religious views on the children, then the Court may remove such restriction. If [Robert] continues to impose his religious views on the children, [Elizabeth] can then petition the Court for further restrictions.[1]

Robert seeks review only of the restriction. He describes the issue before us as, "Did the trial court unnecessarily abridge the respondent's parental rights and freedom of religion by visitation restrictions which absolutely prohibit religious discussion with respondent's children?" We hold that the trial court did not, and we therefore affirm.

## A. FACTS

The parties married in 1980. Their children were born in September 1981, August 1983, and May 1986. The action was filed in June 1988. In September 1988, Elizabeth was awarded temporary legal custody and physical placement of the children. At the time of the trial, the children were nine, seven and four years of age. The divorce judgment was entered in October 1990.

The court stated its findings regarding custody and placement and its reasons for the restriction in a single paragraph. We quote extensively from it:

Based upon the testimony of the parties, the Court finds that joint custody is not appropriate because

---

[1] The 1987 amendments to the custody provisions in ch. 767, Stats., replaced the concept of " 'sole physical custody' . . . and parental 'visitation rights' with a requirement that the court, in child custody actions, allocate periods of physical placement between the parents if it is in the best interest of the child." Comments, 1987 Wis. Act 355. However, the trial court used the term "visitation" and we follow its usage to avoid confusion.

the parties will not be able to make joint decisions particularly because of the husband's religious fundamentalism which indicates that he is the person to make all of the decisions. . .. At the time of the marriage, the respondent converted from Catholicism to Lutheranism. [Robert has subsequently rejected Lutheranism.] He allowed his children to be brought up in the Lutheran church and they should continue to be brought up in that religion. The children are comfortable with both parties, however, there is a problem with the children orally berating their Mother. Both parties evince love for the children, however, the respondent indicates he desires custody because he is with the Lord. The respondent makes moral determinations based upon his religious beliefs and *imposes* those on the children. The respondent's religious beliefs concerning the role of females is detrimental to the children and the children are confused by the different religious teachings of the parties. Although the Social Services study indicated that counseling may be appropriate, the Court believes that counseling would not work here because the counselor could only be someone who is agreeable with the respondent and has similar beliefs. The respondent indicates that he intends to follow God's order, not the Court's. The Social Service studies both consider the issue of visitation in light of the respondent's imposition of his religious views on the children. Although the respondent relied on the protection of the Fifth Amendment in answering questions regarding his conduct after the Temporary Order in this case, the Court finds that the respondent has flaunted the order of the Family Court Commissioner.[2] The Court would normally simply order

---

[2] After granting Elizabeth temporary legal custody and primary placement of the children in September 1988, on May 23, 1990, the family court commissioner ordered,

reasonable visitation, however, that will not work here because the respondent has not followed orders regarding visitation in the past and has violated the Family Court Commissioner's order regarding visitation. Consequently, the Court finds that it is appropriate to award the respondent reasonable visitation supervised by a proper person approved by the Clark County Department of Social Services. The supervised visitation should take place for a reasonable period of time and when it is shown that he can exercise visitation without *imposing* his fundamentalist religious beliefs upon the children, the Court may remove the supervision requirement. If this does not occur, then the petitioner can petition the Court for further restrictions. (Emphasis added.)

We divide our review between the validity of the restriction under state law and its validity under the free exercise of religion provisions in the United States and Wisconsin Constitutions. Only if we conclude that the restriction is valid under state law do we examine its constitutionality. *Butzlaff v. Van Der Geest & Sons*, 115 Wis. 2d 535, 538, 340 N.W.2d 742, 744 (Ct. App. 1983).

## B. VALIDITY UNDER WISCONSIN LAW

Since Robert does not challenge the award of custody and primary placement to Elizabeth, two statutes control the non-constitutional aspects of the issue before

Consequently, the respondent is enjoined and restrained from *imposing* his religious beliefs on the parties' minor children, including but not limited to taking the children to his religious services and activities, educating the children in religious doctrine that is contrary to the Lutheran doctrine which the children have been taught, and telling the minor children that the petitioner's religious beliefs and teachings are wrong. This order does not in any way restrain or enjoin the respondent from practicing his own religious beliefs, however, this order does restrain and enjoin the respondent from *imposing* his beliefs on the minor children. (Emphasis added.)

us. Section 767.24(1), Stats., provides in part that when rendering a judgment of divorce, the trial court "shall make such provisions as it deems just and reasonable concerning the legal custody and physical placement of any minor child of the parties." Section 767.001, Stats., provides in relevant part:

(2) "Legal custody" means:

(a) With respect to any person granted legal custody of a child, other than a county agency or a licensed child welfare agency . . ., the right and responsibility to make major decisions concerning the child, except with respect to specified decisions as set forth by the court or the parties in the final judgment or order.

. . ..

(2m) "Major decisions" includes, but is not limited to, decisions regarding . . . choice of school and religion.

■

Given the unambiguous terms of sec. 767.001(2m), Stats., unless the judgment or order otherwise provides, the parent to whom the trial court awards sole legal custody necessarily holds the sole right to choose the religion of the children. If the custodial parent wishes, the non-custodial parent is excluded from participating in the choice.

■

Because sec. 767.001(2m), Stats., confers on Elizabeth as the custodial parent the sole right to choose the religion of the children, the trial court possesses discretion to fashion reasonable restrictions to protect her choice. First, sec. 767.24(1), Stats., empowers the court to make just and reasonable provisions regarding cus-

tody and placement. The court may therefore place reasonable restrictions on visitation. Second, the custodial parent's exclusive right to choose the religion is meaningless without protection from subversion. Since Robert, as the non-custodial parent, has no right to participate in the choice, he cannot complain if his visits with the children are reasonably restricted to protect Elizabeth's choice.

Because the trial court exercised its discretion on the basis of the facts before it, the question is whether the restriction is reasonable. The answer turns largely on the meaning of the prohibition against Robert's "imposing" his religious views on the children.

Neither party offers a working definition of the verb "impose." Whatever its dictionary meaning, "impose" as used by the trial court means that Robert must not cause the children to reject the religion Elizabeth chooses for them. It is that actual circumstance that impelled the court to create the restriction in the first place.

Elizabeth's choice for herself and the children is the Lutheran church. Robert believes that persons of that faith will go to hell. He has told Elizabeth exactly that in the presence of the children, and he caused them to believe it, since they in turn have told their mother and family friends that if she keeps going to the Lutheran church she is going to hell. One of their meal-time prayers is that their mother becomes a Christian. The only reasonable inference from the undisputed facts is that the children have rejected Elizabeth's chosen Lutheranism and accepted Robert's views. Thus, Robert has succeeded in substituting his religious choice for Elizabeth's.

As suggested by Robert's statement of the issue, the reasonableness of the restriction is primarily a question

of its necessity. While the restriction is unusual, the record supports the trial court's implicit finding that it is necessary in order to protect Elizabeth's choice of religion for the children. While the divorce was pending, the family court commissioner entered the May 23, 1990 temporary order prohibiting Robert from "imposing his religious beliefs" on the children.[3] After the order was entered, the children told Elizabeth that Robert took them to his church and told them he could not do "what the judge commands him to do." Robert stated at the trial that after the temporary order was entered he continued to "teach" his children, that what he teaches is contrary to the Lutheran faith, and that he will not follow a court order contrary to his beliefs.

The restriction is limited in scope and duration. Notwithstanding Robert's characterization of it, the restriction does not "absolutely prohibit religious discussion" with the children. It prohibits him from "imposing" his religious views on the children, in that he cannot, as we have said, cause his children to reject their mother's choice of religion. He may discuss religion with the children so long as he does not cross into causing them to reject their mother's religion. He possesses the power to terminate the restriction. By its express terms, the restriction lasts until Robert shows that his visits can occur without him imposing his religious views.

We conclude that the restriction on Robert's visitation is valid under the law of this state. Since Robert does not assert that the Wisconsin law, expressed in secs. 767.001 and 767.24(1), Stats., is unconstitutional, we next examine his claim that the court-imposed restriction is unconstitutional.

---

[3] *See* note 2.

## C. VALIDITY UNDER UNITED STATES AND WISCONSIN CONSTITUTIONS

The First Amendment to the United States Constitution provides in part, "Congress shall make no law . . . prohibiting the free exercise [of religion]." The first amendment binds the states. *Duncan v. Louisiana*, 391 U.S. 145, 148 (1968). Article I, section 18 of the Wisconsin Constitution, provides in part, "The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed." Because Robert does not argue that this provision should be applied differently from the free exercise clause in the first amendment, we discuss the validity of the court-imposed restriction in light of the United States Constitution. *See State ex rel. Holt v. Thompson*, 66 Wis. 2d 659, 676, 225 N.W.2d 678, 687-88 (1975) (federal and state constitutional provisions regarding religion operate to serve the same purpose).

While we emphatically affirm Robert's right under the United States and Wisconsin Constitutions to hold and profess his religious beliefs, he cannot engage in conduct causing his children to reject the religion Elizabeth has chosen for their children. We reiterate: she has the sole right under Wisconsin law to make that choice as long as she has the sole legal custody of the children, Robert does not challenge the constitutional validity of that law, and Wisconsin law prohibits Robert from depriving her of that choice by causing the children to reject her religion. The free exercise provision in the United States Constitution does not exempt him from that prohibition.

Free exercise of religion does not necessarily mean the right freely to act in conformity with a religion. "The free exercise of religion means, first and foremost, the

right to believe and profess whatever religious doctrine one desires." *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 877 (1990). The United States Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Id.* at 878-79. Nor has the United States Supreme Court ever held "that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation." *Id.* at 882.

The visitation restriction conforms to the protections of the free exercise clause. As we have said, the restriction prohibits Robert from discussing religion with his children only to the extent that it causes the children to reject their mother's choice of religion. Correspondingly, the free exercise of religion includes the right to profess one's faith, but it does not include the right to engage in religious conduct, such as proselytizing, that runs afoul of an otherwise valid law. *Employment Div.*, 494 U.S. at 877-79.[4] A restriction on such conduct is permissible so long as prohibiting the exercise of religion is not the object of a valid law but is merely the incidental effect of such a law. *Id.* at 878.

Limiting Robert's religious conduct is not the object of the visitation restriction. It is the incidental effect of securing Elizabeth's right under a valid law, the custody

---

[4] Robert does not ask us to test the restriction against his right of free speech under the first amendment. *Cf. Murdock v. Pennsylvania*, 319 U.S. 105, 139 (1943) (Frankfurter, J., dissenting) (no one disputes "that the Constitution denies [the government] the right to control the expression of men's minds and the right of men to win others to their views.").

statute, to choose the children's religion. To this point, Robert's discussions and teaching activities have been inextricable parts of a course of conduct which has interfered with Elizabeth's choice of religion for the children. Elizabeth's testimony is uncontradicted. After the September 1988 order giving Elizabeth temporary legal custody, according to her, Robert forbade the children from using certain toys, prohibited them from wearing certain clothing, and interfered with their participation in a Santa Claus-type school skit. After the May 23, 1990, temporary order was issued, every Sunday Robert took the children to his own church and he has taken them to a shopping mall where he distributes religious literature. As Elizabeth put it, the children are "getting this stuff . . . shoved down their throats."

The dissent misperceives our opinion. According to the dissent, we conclude that the free exercise clause cannot negate a validly enacted state law. That is not our opinion. Our opinion is based on the assumption that secs. 767.001 and 767.24, Stats., are not only validly enacted but are *constitutionally* valid, because Robert does not challenge either statute.

The dissent concludes that the state can protect Elizabeth's exclusive right to choose the religion of the children only if they have been emotionally harmed by Robert imposing his views on them. The health of the children is an outrageous price for that protection. No parent in Elizabeth's position should be compelled to pay it. No parent in Robert's position should be allowed to extort it. It is grossly unfair because the children ultimately bear it. No United States Supreme Court decision has authorized it. To the extent that other jurisdictions have implicitly set that price, we reject their

385

decisions. This state need not require harm to the children before protecting Elizabeth's rightful choice.

Finally, we cannot leave unchallenged the dissenting judge's statement "that what is really at work here is the majority's belief that Robert's religious views are incorrect." The statement is false. We have no such belief. Robert's religious views are irrelevant to our analysis. A more reflective reader would understand that we have protected the right of the custodial parent to choose the religion of the children, no matter what the religious views of either parent may be. If legal custody is assigned to Robert, our opinion will protect *his* right to choose the religion of the children, no matter what the religious views of Elizabeth. That was the intention of the Wisconsin Legislature when it gave the parent having legal custody the right to make decisions regarding the religion of the children. Section 767.001(2) and (2m), Stats. Our duty is to implement that intent, regardless of the religious views of the parties to this particular divorce.

We conclude that the visitation restriction does not violate Robert's rights to the free exercise of his religion under the United States and Wisconsin Constitutions.

*By the Court.*—Judgment affirmed.

DYKMAN, J. (*dissenting*). I agree with the majority that sec. 767.001(2m), Stats., gives Elizabeth the sole right to choose the religion of the parties' children. I do not join in the majority's discussion of the validity of the restriction under state law because Robert makes only a vague reference to that issue. I dissent because I disagree with the majority's conclusion that the free exercise clause of the first amendment to the United States Constitution cannot negate a validly enacted state law.

386

The majority bases its conclusion on *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872 (1990), a case holding that the first amendment permits a state to criminalize the use of peyote, when that drug is used in religious ceremonies of the Native American church.[1] Specifically, the majority cites *Employment Division* as holding that the free exercise clause of the first amendment "does not include the right to engage in religious conduct, such as proselytizing, that runs afoul of an otherwise valid law." Majority op. at 383.

There are several problems with the majority's holding that a valid law cannot offend the free exercise clause of the first amendment. First, this interpretation of *Employment Division* can be reached only by a very selective reading of that case. What the Supreme Court really said was:

> But the "exercise of religion" often involves not only belief and profession but the performance of (or

[1] The majority only mentions article I, section 18 of the Wisconsin Constitution in passing because Robert does not argue that this provision should be applied differently from the first amendment. Although Robert relies on article I, section 18, he ignores cases such as *State by Cooper v. French*, 460 N.W.2d 2 (Minn. 1990), where the Minnesota Supreme Court concluded that the Minnesota Constitution grants far more protection of religious freedom than the first amendment. A plurality of the *Cooper* court used Wisconsin authority, *State ex rel. Weiss v. District Bd. of School Dist. No. Eight of Edgerton*, 76 Wis. 177, 44 N.W. 967 (1890), as a basis for its holding. The portion of article I, section 16 of the Minnesota Constitution emphasized by the court in *Cooper* is identical to a portion of article I, section 18 of the Wisconsin Constitution. The opportunity for argument is apparent. But Robert does not cite either *Cooper* or *Employment Division*. Thus, given a clean slate, the majority could have pursued a *Cooper* analysis. But it did not, and I conclude that a dissent is an inappropriate place to pursue that analysis.

abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, *proselytizing*, abstaining from certain foods or certain modes of transportation. It would be true, we think (though no case of ours has involved the point), that a State would be "prohibiting the free exercise [of religion]" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display.

*Employment Div.*, 494 U.S. at 877 (emphasis added).

But that is not all the *Employment Division* Court said. It also discussed several cases in which it struck down validly enacted state statutes because they violated the free exercise clause of the first amendment. The Court said:

The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, or the right of parents . . . to direct the education of their children.

*Id.* at 881 (citations omitted).

So we must look at the trial court's prohibitions to determine whether they not only offend the free exercise clause, but some other constitutional protection as well.

I agree with the majority that the trial court prohibited Robert from imposing his religious views on his children. The record shows that Robert does this by speaking to his children. Thus, the trial court's prohibition involves not only Robert's free exercise clause rights, but his right to freedom of speech, also protected by the first amendment, and his right to "bring up chil-

dren," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), or to "direct the . . . education of [his] children," *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925), protected by the fourteenth amendment.

I conclude that the trial court's prohibition involves not only the free exercise clause, but also the first amendment's protection of speech and the fourteenth amendment's protection of a parent's right to bring up or educate his or her children. Under *Employment Division*, that requires a discussion of whether the trial court's prohibition violates the free exercise clause. The majority's holding that a validly enacted law cannot violate the free exercise clause, though an easy answer, oversimplifies the inquiry. Were the majority correct, a validly enacted Wisconsin statute requiring school attendance for children between the ages of seven and sixteen could not offend the free exercise clause. But the Supreme Court has ruled to the contrary in *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972).

The majority's assertion that I misperceive its opinion points out the problem with its reasoning. The majority bases its opinion on *Employment Division,* a case which examines the conflict between a state statute and the free exercise clause. But, the state action that potentially infringes Robert's free exercise clause rights is a judicial act, not a legislative act. The majority's focus on "an otherwise valid law" and "Elizabeth's right under a valid law" is misdirected and leads to my conclusion that the majority holds that the free exercise clause cannot negate a validly enacted state law. Had the majority stopped with the statement that neither party attacks the validity or constitutionality of any state statute, the issue would have been more straightforward: Does the trial court's order abridge Robert's free exercise clause rights?

Once it becomes apparent that *Employment Division* does not provide an answer to this case, it is necessary to determine the proper test to use when a litigant asserts that a court order abridges his or her rights under the first amendment's free exercise clause. Given the potential for conflict when religious views clash, it is not surprising that many courts have examined the effect of the free exercise clause in family law cases.

The Wisconsin Supreme Court has previously considered the weight to be afforded the parents' religious beliefs in a custody determination. It is inappropriate for a court "to consider the family's religion or to favor one parent over the other in a custody determination on the basis of the parent's attitudes toward religion or the parent's religious affiliation." *Gould v. Gould*, 116 Wis. 2d 493, 503-04, 342 N.W.2d 426, 432 (1984).[2]

The question of whether parents' conflicting religious beliefs may be considered by a court in fashioning visitation privileges, however, is one of first impression in this state. Courts in other jurisdictions have passed upon this issue. *See* Annotation, *Religion as Factor in Child Custody and Visitation Cases*, 22 A.L.R.4th 971 (1983), and cases collected therein.

In a leading case, *In re Murga*, 163 Cal. Rptr. 79 (Cal. Ct. App. 1980), the mother requested that the father's visitation be conditioned upon his willingness to engage in only such religious teachings as the mother approved. She asserted that as a result of the father's imposition of strict Protestant attitudes and practices, "the child hate[d] religion and refuse[d] to go to church

---

[2] Under ch. 767, Stats., the legal custodian of the child is charged with the "right and responsibility to make major decisions concerning the child," sec. 767.001(2)(a), Stats., including "decisions regarding . . . choice of . . . religion," sec. 767.001(2m), Stats.

with her." *Id.* at 80. Rejecting the mother's contention that she had an absolute right to direct the child's religious upbringing, the California Court of Appeal observed:

> [I]n the majority of American jurisdictions that have considered the question, the courts have refused to restrain the noncustodial parent from exposing the minor child to his or her religious beliefs and practices, *absent a clear, affirmative showing that these religious activities will be harmful to the child.* The refusal to intervene in the absence of a showing of harm to the child reflects the protected nature of religious activities and expressions of belief, as well as the proscription against preferring one religion over another.

*Id.* at 82 (citations omitted; emphasis added).[3]

In *Felton v. Felton*, 418 N.E.2d 606 (Mass. 1981), the father became a member of the Jehovah's Witnesses after separating from the mother. The father's sect of

---

[3] For cases in accord with the majority rule as articulated in *In re Murga*, see *In re Mentry*, 190 Cal. Rptr. 843, 846-48 (Cal. Ct. App. 1983); *Compton v. Gilmore*, 560 P.2d 861, 863 (Idaho 1977); *Felton v. Felton*, 418 N.E.2d 606, 607 (Mass. 1981); *In re Heriford*, 586 S.W.2d 769, 772 (Mo. Ct. App. 1979); *Pope v. Pope*, 267 S.W.2d 340, 343 (Mo. Ct. App. 1954); *Peterson v. Peterson*, 474 N.W.2d 862, 871-72 (Neb. 1991) (per curiam); *LeDoux v. LeDoux*, 452 N.W.2d 1, 5 (Neb. 1990) (per curiam); *Sanborn v. Sanborn*, 465 A.2d 888, 893-94 (N.H. 1983); *Brown v. Szakal*, 514 A.2d 81, 84-85 (N.J. Super. Ct. Ch. Div. 1986); *Paolella v. Phillips*, 209 N.Y.S.2d 165, 167 (N.Y. Sup. Ct. 1960); *Morris v. Morris*, 412 A.2d 139, 143-44 (Pa. Super. Ct. 1979); *Munoz v. Munoz*, 489 P.2d 1133, 1135-36 (Wash. 1971); *Robertson v. Robertson*, 575 P.2d 1092, 1093 (Wash. Ct. App. 1978). *See also* Annotation, *Religion as Factor in Child Custody and Visitation Cases*, 22 A.L.R.4th 971 (1983).

Jehovah's Witnesses forbade celebrations of birthdays and Christmas and disapproved of holiday symbols such as the Easter bunny and Santa Claus. *Id.* at 608-09. The trial court granted the mother's request to forbid visitation unless the father refrained from "instructing the children in his religion." *Id.* at 606.

The Supreme Judicial Court of Massachusetts reversed, rejecting the trial court's assumption that differences of religion, at least where one of the parents is a religious zealot, have such a grave, damaging effect on the children as to require the censorship imposed by the judgment. The appellate court said: "The [trial court's] assumption is far from self-proving." *Id.* at 610; *see also Munoz v. Munoz*, 489 P.2d 1133, 1136 (Wash. 1971) (duality of religious beliefs, per se, does not create a conflict in young children's minds).

Courts have insisted that a parent seeking to enjoin religious activities during visitation clearly demonstrate that exposure to conflicting religious beliefs will be harmful to the child. "[H]arm to the child from conflicting religious instructions or practices . . . should not be simply assumed or surmised; it must be demonstrated in detail." *Felton*, 418 N.E.2d at 607. The custodial parent must make a factual demonstration that the conflicting religious beliefs are, or will be, emotionally damaging to the children. *Brown v. Szakal*, 514 A.2d 81, 84 (N.J. Super. Ct. Ch. Div. 1986). "[M]ere conclusions and speculation" will not suffice. *Robertson v. Robertson*, 575 P.2d 1092, 1093 (Wash. Ct. App. 1978).

In *LeDoux v. LeDoux*, 452 N.W.2d 1 (Neb. 1990) (per curiam), the Nebraska Supreme Court upheld an order similar to the one at issue here. In *LeDoux*, the father became a Jehovah's Witness shortly before he separated from the mother, a Catholic. At trial, a clinical psychologist testified that the conflicts between the two

religions contributed to the stress felt and manifested by the child. *Id.* at 3. He stated: "[W]ithout any further development and work between [the child] and his father, I do believe [the child] would experience very substantial stress." *Id.* at 4. Similarly, in *Morris v. Morris*, 412 A.2d 139, 147 (Pa. Super. Ct. 1979), the court upheld a visitation restriction where a clinical psychologist testified that "the inconsistent teachings would probably result in some mental disorientation" to the child.

By contrast, the court in *Felton* found the mother's testimony deficient because there was "a failure of proof about [the child's] physical and emotional condition or about any causal connections between her visits with her father and that condition, such as it may have been." 418 N.E.2d at 610. And in *Compton v. Gilmore*, 560 P.2d 861, 863 (Idaho 1977), the Idaho Supreme Court rejected a restriction where "the court's sole relevant finding of fact was that the child exhibited 'strange,' 'unusual' and 'aggressive behavior' after visits with her father. No finding was made that such behavior was in any way *caused by the religious differences* of the parents." (Emphasis in original.) *See also In re Mentry*, 190 Cal. Rptr. 843, 847 (Cal. Ct. App. 1983) (evidence is manifestly insufficient when it consists only of testimony by the mother concerning her distress at the father's religious activities with the children, and speculation by a counselor who had never seen or interviewed the children).

I do not suggest that emotional harm may only be established by expert testimony. Acceptable types of proof were catalogued in *Pope v. Pope*, 267 S.W.2d 340 (Mo. Ct. App. 1954), where the court observed:

> Conceivably a parental dispute over religion might be waged in such a manner as to create in the mind of the innocent victim a deep-seated religious conflict which eventually would affect, or threaten to affect, the child's mental health. . .. But that is not the situation here, so far as this record discloses. Plaintiff gave brief testimony, in seven words, that "There is a conflict in his mind." She did not explain or enlarge on this bare statement except to give her opinion that the question becomes increasingly important as the child grows older. *She did not testify to any facts from which it might be inferred that it is a serious conflict, or that his welfare has been adversely affected thereby. She gave no testimony whatever that his general demeanor, attitude, school work, appetite, health or outlook has been affected one iota by the so-called conflict in his mind.*

*Id.* at 343 (emphasis added). However, expert testimony can be valuable in deciding matters of this nature.

The trial court's findings in this case, that the conflicting religious beliefs were "confus[ing]" and "detrimental" to the children, do not meet the "harmful to the child" test required by *In re Murga* and other cases which have addressed this issue. "General testimony . . . that the child was upset or confused" will not, by itself, support restriction. *Felton*, 418 N.E.2d at 610. The trial court must identify specific examples of emotional harm caused by the religious conflict.

When a trial court's findings are inadequate to support its exercise of discretion, we independently review the record to determine whether it provides a basis for the trial court's exercise of discretion. *State v. Pharr*, 115 Wis. 2d 334, 343, 340 N.W.2d 498, 502 (1983). I do not locate sufficient evidence of record to support the trial court's decision to impose restrictions on Robert's exercise of his religious beliefs.

Elizabeth testified concerning the disruptive effect Robert's views were having on her ability to parent the children. She stated that it was her opinion that exposing the children to conflicting religious ideas was "not good" and had "to have some [e]ffect on them." She also stated:

> I want [Robert] to believe whatever he wants. But when it causes undue stress and disorientation in children, then something has to be done about it.

Elizabeth did not testify, however, that the children were experiencing emotional harm as a result of the disparate religious beliefs. Nor did she identify specific examples of how the conflict had affected her children's behavior or school work or their physical or mental health. *See Pope*, 267 S.W.2d at 343.

The majority does not concern itself with this lack of proof. Instead, it generates its own facts to support its conclusion. Apparently, under these facts, the children are in ill health as a result of Robert's religious discussions. The children "bear" some grossly unfair burden, though what that burden is or how that burden affects them is unarticulated. Usually, appellate courts look to trial courts to determine the facts of the case. If the majority were to do that, it would have to conclude that what Robert has done is to take the children to church, visit with them about religion and attempt to impose his religion on them.

The unfortunate result of the majority's decision is that three young girls will be deprived of a relationship with their father. True, Robert could obey the trial court's order and refrain from discussing religion with his children. But, his religious beliefs do not afford him that choice. As Robert candidly explained to the trial

court, when he is forced to choose between God's law and the judge's order, he must obey God's law.

Notwithstanding its protestations to the contrary, the majority's rejection of all relevant precedent suggests that what is really at work here is the majority's belief that Robert's religious views are incorrect. *See* maj. op. at 385. This may be easy to do because Robert's church, the Good News Messengers, is not a well-known religion, and its views are probably not widely held. But Robert could be making the same arguments were he a member of the Catholic church attempting to impose his beliefs on his children as to birth control, abortion, homosexuality and women in the priesthood, over the strenuous objection of a previous wife. How Wisconsin judges feel about religious issues should not be the basis for conditions of physical placement. "Intervention in matters of religion is a perilous adventure upon which the judiciary should be loathe to embark." *Donahue v. Donahue*, 61 A.2d 243, 245 (N.J. 1948).

Ultimately, the overriding problem with the majority's analysis is its refusal to recognize that there is any rule or test to determine whether state action in any form is overridden by the free exercise clause of the first amendment or article I, section 18. "This state need not require harm to the children before protecting Elizabeth's rightful choice." Majority op. at 385. "To the extent that other jurisdictions have implicitly set that price, we reject their decisions." *Id*. Though the majority disclaims its result, the inevitable conclusion reached is that because Elizabeth was granted the right to choose the children's religion by a valid statute, a judge's order made pursuant to that statute cannot violate the free exercise clauses of the United States and Wisconsin Constitutions.

There *is* a test for deciding free exercise conflicts. In *Yoder*, 406 U.S. at 215, the Court said:

> The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. We can accept it as settled, therefore, that, however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests.

The state interest in *Yoder* was to educate children until age sixteen. The religious belief was that school attendance beyond grade school would endanger the children's salvation. The state's interests lost out to the free exercise clause. *Id.* at 234. Put another way, we apply the "strict scrutiny" test to attempted governmental encroachment on the free exercise clause. *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 141-42 (1987).

It is no wonder, therefore, that courts that have considered cases similar to the Langes' situation have applied the "grave harm" test to states' attempts to limit a noncustodial parent's desire to explain religious beliefs to his or her child.

The majority does not explain why Wisconsin ought to stand alone in requiring no test to determine whether state action passes constitutional muster. Rejecting the opinions of the other states is a decision, but not an explanation.

Since I have concluded that the record does not support the trial court's decision to restrict Robert's visitation, the question of an appropriate mandate arises. In *In re T.R.M.*, 100 Wis. 2d 681, 688-89, 303 N.W.2d 581, 583-84 (1981), the court concluded that in domestic law controversies, a remand for findings is appropriate. Were

I writing for the majority, I would remand so that the trial court could, after evidentiary proceedings, find whether Robert's actions had a grave, damaging effect on the parties' children. If the trial court could cite specific examples demonstrating such an effect, then it would be justified in entering an order which would abridge Robert's first amendment rights.

RECONSIDERATION of the decision filed March 18, 1993.

Dated: May 18, 1993.

Before Gartzke, P.J., Dykman and Sundby, JJ.

GARTZKE, P.J. Robert Lange has petitioned for review. We may reconsider our decision. Rule 809.24, Stats. On reconsideration, we confirm our decision.

Robert asserts that we failed to consider his constitutionally based "parental rights" claim. He bases his parental rights claim on three United States Supreme Court cases: *Meyer v. Nebraska,* 262 U.S. 390 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510 (1925); and *Wisconsin v. Yoder,* 406 U.S. 205 (1972).

When invalidating a state statute which restricted teaching in foreign languages, the *Meyer* court referred to the right to "bring up children" as a liberty protected by the fourteenth amendment. 262 U.S. at 399. The *Pierce* court invalidated a state compulsory public school attendance statute because it "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. at 534-35. The *Yoder* court struck down the convictions of Amish parents who had violated another school attendance statute on religious grounds.

Because, however, Elizabeth has legal custody of the children, sec. 767.001(2m), Stats., vests in her the sole

right to make major decisions for the children, including the right to choose their religion. Consequently, the statute deprived Robert of that specific parental right. He has not challenged the constitutionality of the statute, and the decisions of the United States Supreme Court on which he relies are therefore not on point.

Robert states that Elizabeth's right under sec. 767.001(2m), Stats., to choose the religion for their children does not extinguish his constitutional right to have input regarding the children's upbringing and values. But to the extent he desires to have input into the children's choice of religion, he lost that right.

Robert asserts in his petition that although he did not attack the facial constitutionality of sec. 767.001(2m), Stats., he challenged it as applied if it is "construed to give the custodial parent an absolute veto over religious speech uttered by the non-custodial parent." Robert's brief contains no such attack. In any event, we have not construed the statute to give such a veto to the custodial parent. The statute gives the custodial parent the choice of religion for the children, and we construe it to provide that parent with protection from subversion of his or her choice.

Robert asserts that *Employment Division v. Smith,* 494 U.S. 872, 881–82 (1990), is not on point because there the court distinguished the case before it as not involving a hybrid situation, such as a free exercise claim connected with a parental right. We repeat: Robert lost the parental right to choose his children's religion, he lost the right by operation of sec. 767.001(2m), Stats., and he has not claimed that the statute violates the constitution. We do not have a hybrid situation before

us any more than did the United States Supreme Court in *Employment Division.*

*By the Court.*—The decision filed in this case on March 18, 1993, is confirmed.

DYKMAN, J. *(dissenting).* Robert Lange has filed a petition to review the majority decision in this case, asserting that his first amendment, free exercise rights were abridged by the trial court's order conditioning his visitation on his silence regarding religious matters during such visitation.[1]

The majority now asserts that this case does not involve a constitutional issue because Robert did not raise the issue of the constitutionality of sec. 767.001(2m), Stats., in his briefs to this court.

The problem with this conclusion is that it either begs the question, or is untrue. One needs to examine the record to see how Robert's first amendment claim arose.

In the trial court, Robert sought custody of his daughters. Robert had no reason to assert a constitutional right in this context. This issue was contested, and the trial court's oral decision went against Robert. The court then went on to grant visitation to Robert. The court did not mention sec. 767.001(2m), Stats. Robert is complaining of the conditions of the court's grant of visitation, not the constitutionality of sec. 767.001(2m). Indeed, all that that statute does is to define choice of religion as a "major decision."

Robert has not attacked the facial validity of sec. 767.001(2m), Stats. Such an attack would be frivolous. But he assuredly has raised the issue of the conflict between the trial court's order and the free exercise clause of the first amendment. On the first page of his

---

[1] Section 767.001(5), Stats., has now replaced the term "visitation," used by the trial court, with the term "physical placement."

396d

brief he writes: "This case presents important issues of religious freedom and parents' rights." His explanation of his entire argument is: "THE TRIAL COURT UNNECESSARILY ABRIDGED MR. LANGE'S FREEDOM OF RELIGION AND HIS PARENTAL RIGHTS BY ITS BLANKET PROHIBITION O[F] RELIGIOUS DISCUSSION AND RELIGIOUS ACTIVITY DURING VISITATION." (Capitalization in original). He cites the appropriate sections of the United States and the Wisconsin Constitutions. He cites twenty cases and a law review article which he asserts support his position. He recognizes that sec. 767.001(2)(a), Stats., gives Elizabeth the right to make decisions regarding choice of religion.

Robert's petition for review does not use language identical to that used in his briefs in this court. Robert made the following argument in his brief to this court:

> Missouri has a statute which, like Wisconsin's, indicates that ordinarily the custodial parent may determine a child's religious training. A custodial parent, the mother, sought visitation restrictions under this statute. The court said her position, that the statute gave "her the absolute, total and unqualified right to determine all aspects of the children's religious training in the absence of any further showing, is untenable." *In re Marriage of Heriford,* 586 S.W.2d 769 (Mo. [Ct.] App. 1979).
>
> This court should reach a similar construction with respect to sec. 767.001[,] Stats. *Any other construction would render the statute unconstitutional, inasmuch as it is axiomatic that a legislative enactment cannot nullify constitutional rights.* [Emphasis added.]

Given the majority's decision, Robert may have erred in his assessment of what is axiomatic as to ques-

tions of constitutional law. But it takes a strained and narrow view of Robert's briefs to assert that he has waived the only issue that he presented in this court. Whether one views the issue as the constitutionality of sec. 767.001(2) and (2m), Stats., as applied, or as the constitutionality of the trial court's restrictions on Robert's visitation, the result is the same. Robert is complaining that the free exercise clause of the first amendment protects him from such an order absent a finding that his children would be gravely damaged without it. Robert has raised this issue beyond any doubt.

The majority apparently continues to assert that no test is necessary when weighing state action against first amendment, free exercise rights because it asserts that Robert lost his constitutional right to have input into the children's religious values. But, as I explained in my previous dissent, some test is necessary before reaching that conclusion. In Wisconsin, we have considered the closely related question of child custody. In *Welker v. Welker,* 24 Wis.2d 570, 576, 129 N.W.2d 134, 138 (1964), the court said:

> When custody of a child is in issue, the court has a narrow scope of inquiry regarding the religious concepts of the parents: Does the prospective custodian hold views which might reasonably be considered dangerous to the child's health or morals?

I recognize that there are limits to the first amendment's free exercise clause protections. Other courts facing the same issue we now face have recognized this. That is why other courts have adopted the "grave, damaging effect" test. The first amendment does not protect religious practices that have a grave, damaging effect on children. Here, however, there is no evidence that there is such an effect on the parties' children. That is why I

concluded in my first dissent that this matter should be remanded to the trial court to determine whether Robert's practices meet the appropriate test.

The record shows that the Lange children are perfectly aware that their parents have differing religious beliefs. It cannot be surprising to children that their parents sometimes disagree. At some point in time, if they have not already done so, the Lange children will recognize that their parents' exercise of religion is constitutionally protected. I would accord them the right that the first amendment grants to children in other jurisdictions—to learn of religion from both of their parents if a court determines that their parents' religious teachings do not have a grave, damaging effect on them.