IN RE the PATERNITY OF SHALYNDA S.J.:

STATE of Wisconsin, Petitioner-Respondent,

v.

ALICE H., Respondent-Appellant,

MELVIN R.J., Respondent-Respondent.

Court of Appeals

*No. 99–2812. Submitted on briefs September 12, 2000.—Decided September 28, 2000.*

2000 WI App 228

(Also reported in 619 N.W.2d 151.)

195

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Laura M. Sutherland* and *Jennifer S. Mirus* of *Boardman, Suhr, Curry & Field LLP*.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Ruth Westmont* of *Westmont Law Office*.

Before Dykman, P.J., Vergeront and Roggensack, JJ.

¶ 1. VERGERONT, J. Alice H. appeals an order of the trial court granting sole legal custody and primary physical placement of her daughter, Shalynda, to her daughter's father, Melvin R.J. That order denied physical placement to Alice and directed that, in order to resume periods of placement with Shalynda, Alice must be able to genuinely commit herself to refraining from certain behavior that had been adverse to Shalynda. Specific conditions for resumption of Shalynda's placement with Alice included that Alice undertake psychological treatment with either one of

196

two named therapists, and when that therapist considered it appropriate to resume periods of placement with Shalynda, her therapist would consult with Shalynda's therapist and develop a plan leading up to unsupervised periods of placement.

¶ 2. Alice contends the evidence was not sufficient for an order denying her all physical placement and the trial court exceeded its statutory authority in ordering her to undergo psychological treatment with specific health care providers as a condition to regaining physical placement. We conclude the evidence was sufficient to establish that placement with Alice, including supervised placement, endangered Shalynda's mental and emotional health. However, we conclude that certain of the conditions imposed for regaining physical placement—including the requirement that she see one of two therapists—are not necessary to prevent a danger to her daughter's mental or emotional health and that the order appears to impermissibly limit Alice's right to seek revision of the conditions. We therefore reverse the portion of the order imposing the conditions and remand for further proceedings.[1]

¶ 3. Alice also asks that we reverse the court's order pursuant to our discretionary authority under WIS. STAT. § 752.35 (1997–98)[2] on the ground that the issue of denying Alice physical placement was not fully tried. We conclude that the issue of whether physical

---

[1] Because of this disposition, it is unnecessary to consider Alice's contention that the court violated her right to due process by adopting post-trial recommendations for the conditions without conducting a hearing or providing her the opportunity to respond to the recommendations.

[2] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

placement with Alice endangers her daughter's mental or emotional health was fully tried, and we therefore decline to use our discretionary powers to reverse the court's determination of that issue.

¶ 4. Accordingly, we affirm in part, reverse in part, and remand for proceedings consistent with this decision.

## BACKGROUND

¶ 5. Shalynda was born on March 2, 1992. Melvin was adjudged her father in a paternity judgment entered on May 16, 1996, and Alice was awarded sole legal custody. Later in May, a petition alleging Shalynda was a child in need of protection and services (CHIPS) was filed, and Shalynda was removed from Alice's home. On January 22, 1997, the court in the CHIPS action ordered Shalynda to be placed with Melvin under the supervision of the Dane County Department of Human Services until January 21, 1998. One of the conditions of that order was that Melvin was not to permit Alice to have contact with Shalynda unless it was arranged or preauthorized by the county agency, and he was to report to the social worker any attempts by Alice to have such contact with Shalynda. Shalynda has lived with Melvin since that order.

¶ 6. In October 1997, Melvin filed a motion in the paternity action requesting legal custody and placement of Shalynda, and asking a custody study to begin at that time so it could be finished prior to the expiration of the CHIPS order. The case was referred to Family Court Counseling Service. Since the study was not completed in January 1998, Melvin moved, again in the paternity action, for temporary custody and placement of Shalynda pending completion of the custody

study. By agreement, the CHIPS order remained in place until a hearing was held on February 24, 1998, on Melvin's motion. At the close of the hearing, the court granted temporary legal custody and primary physical placement to Melvin, and visitation with Alice every other weekend.[3]

¶ 7. While Dr. Jon Aaronson of Family Court Counseling Service was conducting the study regarding Shalynda's custody and placement, there were disputes between the parties concerning compliance with the temporary order. More specific orders were entered regarding the timing of Shalynda's placement with Alice and the transition period, and an ex parte order was entered that Alice not enter Lowell School, where Shalynda attended, because of disruptions Alice had caused there.

¶ 8. The custody study was filed with the court on July 13, 1999.[4] Dr. Aaronson recommended that Melvin and Alice have joint legal custody of Shalynda, with Melvin to have "impasse authority"; and that primary placement be with Melvin, and placement with Alice be on alternate weekends and Saturdays on the "off" weekend. Dr. Aaronson's report relied in part on a custody and physical placement report dated February 27, 1998, prepared by Dr. Kenneth Waldron, a psychologist.[5]

---

[3] The written order was entered on May 11, 1998.

[4] Apparently Alice was confined in the Milwaukee House of Corrections on a misdemeanor conviction and the custody study was placed on hold during that time.

[5] Dr. Waldron's report recommended primary physical placement with Melvin and placement alternate weekends with Alice. The report also stated that he had serious concerns about Alice's "blatant efforts to denigrate and criticize Melvin and Margery [the woman with whom Melvin lived], and the use of

¶ 9. The final hearing was scheduled to occur in early August 1999, but was postponed until October 7, 1999. Just prior to the scheduled August date, Alice violated the court order by keeping Shalynda for a week beyond the authorized weekend and not letting anyone know of her whereabouts. Alice substituted attorneys and her new attorney asked for a postponement, which the court granted, ordering Alice to have no placement pending further order of the court.

¶ 10. On September 30, 1999, Dr. Aaronson supplemented his July report and changed his recommendation based on a recent letter from Shalynda's therapist, Meredith Whelan, and on consultation with Dr. Waldron. Dr. Aaronson's revised recommendation was that Shalynda have no period of placement in Alice's care; that Melvin be her sole legal custodian; and that before the court resume Alice's access to Shalynda, Alice be required to make a showing that she understood the emotional consequences of her behavior to Shalynda and was prepared and committed to refrain from such behavior in the future.

¶ 11. The letter from Whelan included the following statements. Before the recent event of Alice not returning Shalynda, Shalynda had expressed mixed feelings about seeing Alice. However, after the recent incident, there was a significant shift in Shalynda's feelings. She was very aware Alice had kept her beyond the length of the normal visit and she felt sad about it. Shalynda stated that she does not want to see Alice, and, although she still has some ambivalence, she

---

her time to instigate allegations against them," but completely breaking off Shalynda's attachment with Alice could be "even riskier. However, this kind of behavior is emotionally threatening and should it continue might be considered reason to terminate visits all together."

rarely talks about missing Alice. The themes of play therapy initiated spontaneously by Shalynda most often concern, among other subjects, verbal and physical abuse of children by a mother figure and the mother figure threatening characters who attempt to intervene to protect the child. In therapy, Shalynda acts out issues of fear, aggression, violence, and abandonment, which is consistent with a child who is attempting to process trauma. Shalynda stated she feels sad most often when she is with her mother, that she does not feel safe with her, that Alice lies, and that in the past Alice has beaten her with an extension cord and with a belt.

¶ 12. As additional reasons for his changed recommendation, Dr. Aaronson mentioned other incidents prior to the one occurring in early August, when Alice returned Shalynda to Melvin later than authorized, without advising anyone of her whereabouts, even though she had been advised of the detrimental impact of this on Shalynda, and even though she had agreed not to repeat that behavior. Dr. Aaronson stated that Alice had shown herself to be unrestrained by court orders that limit or place conditions on her access to Shalynda. He also stated that Alice's conduct involving Shalynda in false allegations regarding her father's perpetration of physical or sexual abuse was emotionally harmful to Shalynda.

¶ 13. At the final hearing, Dr. Waldron and Dr. Aaronson testified, as did Alice, Melvin, Margery (the woman with whom Melvin lived), and the social worker at Shalynda's school. At the close of the evidence, the guardian ad litem asked that Alice not be allowed to have contact with Shalynda except in a therapy setting with the child's therapist and at the therapist's recommendation. Melvin's attorney concurred in that

request. Alice's attorney contended that the evidence was not sufficient to give Melvin either primary placement or sole legal custody, or to require that visitation be supervised by Shalynda's therapist.

¶ 14. The court rendered an oral decision. It found Shalynda was in a stable home environment with Melvin; she was benefiting from that environment and her needs were being met; there was no evidence of a credible nature to indicate there had ever been any abuse of Shalynda by her father; and he seemed to be taking control of his problems with drug abuse. The court found, based on the testimony of Dr. Waldron, that Alice suffered from a severe personality disorder that manifested itself in conduct that was pertinent to the issues before the court; she engaged in high-risk behavior that was destructive for Shalynda and showed a lack of compassion and empathy for others, including her child. The court found Shalynda had been harmed by Alice's disobedience of the court orders in failing to return the child in a timely manner, by repeated allegations to the child about the conduct of Melvin and Margery, filing false reports to the police regarding sexual misconduct perpetrated upon Shalynda, and by coaxing Shalynda to lie about Melvin.

¶ 15. The court determined that it was in Shalynda's best interests for Melvin to have exclusive placement. The court also determined Alice should not have physical placement until the court, or such person as the court designated, determined she understood the emotional consequences of her behavior to Shalynda and was committed to refraining from that behavior in the future. The court stated that it wanted to put into place some meaningful conditions for the development of future physical placement with Alice,

but it was not prepared to do so on that day. The court asked the guardian ad litem and both counsel to submit proposals for accomplishing that. The court continued prohibiting Alice from coming to Shalynda's school.[6]

¶ 16. Pursuant to the court's request, the parties submitted written proposals. Alice proposed that the Safe at Home program supervise weekly two-hour visits with Shalynda at her home. Melvin proposed that supervised visitation occur with a supervisor acceptable to the guardian ad litem, and that participation at Safe at Home or parenting classes be a condition of unsupervised visitation. Dr. Aaronson, Dr. Waldron, and the guardian ad litem made a joint proposal. They recommended Alice be treated by a local therapist "known to us to have training and experience to provide therapy to persons with severe personality disorder," and gave two names "which readily come to mind." The purpose of the treatment would be to enable Alice to meet the condition that she understand the emotional consequences to Shalynda of her past abuse of placement sufficient to commit herself to refrain from such behavior in the future. When Alice attained the support of her therapist to resume periods of physical placement with Shalynda, her therapist would then consult with Shalynda's therapist regarding a plan to resume placement.[7]

---

[6] The court also asked for proposals on monitoring Melvin's situation with drugs. However, neither the monitoring of Melvin nor the court's award of sole legal custody and primary placement with Melvin is an issue on this appeal.

[7] The proposal gave this example of such a plan: ". . . in a therapeutic setting until it is agreed by the therapist that both mother and child are prepared to share time together outside the clinical setting, say, for brief periods of supervised placement in the community, which then may be preparatory to

203

¶ 17. Following receipt of these proposals and without a hearing, the court notified the guardian ad litem by letter, with a copy to the parties and their counsel, that it had decided to accept the joint recommendation of the guardian ad litem, Dr. Aaronson, and Dr. Waldron. The court directed the guardian ad litem to prepare a final order for the signature of the court. The court then repeated the terms of the joint recommendation with the modifications that Alice's therapist "should" be either one of the two names mentioned, and the plan "should" incorporate the "Hewitt Model," thus making these requirements. The order finally entered by the court contained the terms as outlined in its letter, although it was signed by a different judge.[8]

## DISCUSSION

*Denial of Placement*

██

¶ 18. Custody and placement decisions are committed to the trial court's discretion, and we sustain them on appeal when the court exercises its discretion based on the correct law and the facts of record, and employs a logical rationale in arriving at its decision.

---

unsupervised periods of placement." The proposal also stated that "a specific part of the agreement to resume placement might well be the incorporation of the 'Hewitt Model' " under which "the significant adults to the child agree about the inappropriate verbal behavior and other actions which are to be proscribed from any of their (or others) interaction with the child. There is then an understanding reached among the adults with the child as to persons to whom she *should* report any departure from the agreed upon standards protective interpersonal conduct."

[8] *See* footnote 13.

*See Koeller v. Koeller*, 195 Wis. 2d 660, 663–64, 536 N.W.2d 216 (Ct. App. 1995). A court may deny a parent's physical placement rights at any time, upon motion of a party or on its own motion, if it finds that "physical placement rights would endanger the child's physical, mental, or emotional health." WIS. STAT. § 767.325(4).

¶ 19. We first address Alice's contention that the record was insufficient to support an order denying her all physical placement with Shalynda. We conclude there was sufficient evidence to support a finding that placement with Alice was a danger to Shalynda's mental and emotional health. Shalynda's therapist described Shalynda as traumatized by her interactions with her mother, needing to work through that trauma in therapy, and having no desire to see her mother after the last episode where her mother kept her for nine days when she was supposed to have her only over the weekend. Dr. Waldron's evaluation in February 1998 and Dr. Aaronson's report described numerous incidents in which Alice had made serious allegations against Melvin and Margery which were investigated and determined to be false. She involved Shalynda in some of these allegations. Dr. Waldron described the conflict, confusion, and anxiety this conduct caused Shalynda in his February 1998 report, and this was the reason that he recommended placement with Alice to be reviewed in one year. By the time of the final hearing, more than a year later, Alice's conduct that was detrimental to Shalynda had not decreased but had increased.

¶ 20. There was evidence Alice had gone to Shalynda's school, in spite of a court order that she not do so, with the purpose of getting Shalynda to change her report of certain incidents in ways that would be

detrimental to Melvin; Alice tape-recorded Shalynda's responses, and two boys who observed the interaction described Shalynda as frightened. Alice also took Shalynda to the police department with her, alleging that Melvin beat Shalynda with a belt. Alice continued to have the police go to Melvin's home to investigate her allegations that Margery was physically abusing Shalynda. Alice acknowledged that she had recently kept Shalynda one week when she was not authorized to, and let no one know where she was. Besides that incident, there were other occasions when she kept Shalynda beyond the time authorized by court order, and, on one occasion, when there had been an agreement that she have Shalynda for a specified number of hours on Christmas day, she had taken her to Milwaukee for a few days without telling anyone where she was. Alice did not dispute this conduct, but justified it by her concerns about Shalynda, and testified that this behavior did not adversely affect Shalynda.

¶ 21. Dr. Waldron testified that Alice had a severe personality disorder, and that he saw no evidence that she was able to have compassion or empathy for others. He elaborated on the adverse effects on Shalynda of being involved in or witnessing Alice's efforts to undermine Melvin and Margery. He described Whelan's letter as indicating to him that Shalynda did not have a normal parent/child bond with her mother, but, rather, a "trauma bond," and opined that it would not be harmful to lose such a bond, but that it would be helpful.

¶ 22. This testimony and the reports are a sufficient basis for the court to find that physical placement with Alice endangers Shalynda's mental and emotional health.

¶ 23. Alice contends in her brief, as she did at trial, that much of her conduct was motivated by her concerns for Shalynda, and that it is conduct typical of many custody disputes. However, Dr. Waldron and Dr. Aaronson had a different assessment of her motives, and the court was entitled to accept their assessment rather than Alice's.[9] She also contends she is simply being punished for violating the court orders regarding placement. That contention is not supported by the record. Her violation of the court orders is relevant because of its harmful effect on Shalynda, and because it supports the opinion of Dr. Waldron and Dr. Aaronson that she is not concerned with the harmful effect of her conduct on Shalynda. Finally, Alice points to testimony from Dr. Waldron that noted positive aspects of Alice's parenting. However, in his view, those did not prevent other actions of Alice from being harmful to Shalynda, and the court was entitled to rely on his overall assessment of the impact of Alice's conduct on her daughter.

¶ 24. Alice also appears to contend that the court should have ordered supervised visits, rather than denying placement or visits altogether. It is true that Melvin proposed supervised visits. However, the

---

[9] Alice points to one instance in which, she asserts, her allegations were proven correct. She had alleged that a son of Melvin asked Shalynda to pull down her pants. In Dr. Aaronson's report, he recommended that Shalynda continue to have no contact with this son (who does not live with Melvin) until it was determined he presented no danger to her. This recommendation does not show that the allegation is true; it shows that it is being investigated. Even if this allegation turns out to be true, that does not undermine Dr. Waldron's and Dr. Aaronson's assessment of Alice's motivations for the many false allegations against Melvin and Margery.

guardian ad litem recommended a denial of all placement with Alice, and, even had she not, under WIS. STAT. § 767.325(4), the trial court may do so without a motion from any party. The question, therefore, is whether the court erroneously exercised its discretion in denying all placement rather than permitting supervised visits, and we conclude it did not. Certain of the harm to Shalynda from her mother's conduct could have been prevented with supervised visits: the harm to her from future incidents of being kept by Alice in defiance of court orders and without anyone knowing where she was, and, to some extent at least, the harm to her from future efforts of Alice to involve Shalynda in hostilities against Melvin and Margery. However, the record supports a conclusion that, at this time, Shalynda was suffering such adverse effects from Alice's past conduct that it endangered her mental and emotional health to be with Alice even in a supervised setting.

*Conditions for Regaining Placement*

¶ 25. Alice contends that the court exceeded its statutory authority, both in ordering that she undergo psychological treatment as a condition of regaining placement, and that she undergo treatment with particular therapists. She points out, correctly, that in family law matters the court's authority is limited to that which is specifically authorized by statute. *See Jocius v. Jocius*, 218 Wis. 2d. 103, 111, 580 N.W.2d 708 (Ct. App. 1998). In *Jocius*, we held that while WIS. STAT. § 767.325(4) authorizes a court to deny physical placement to a parent, it does not authorize a prospective order prohibiting a parent from requesting a change in physical placement in the future. *See Jocius*, 218 Wis.

2d at 118. Our reasoning (borrowing from *Koeller*, which concerned legal custody and not a denial of physical placement) was that the statute authorized the court to make a decision based on historical and present factors, and did not authorize decisions regarding future events or contingencies, regardless of whether such prospective orders were in the child's best interests. *See Jocius*, 218 Wis. 2d at 117–118.

¶ 26. In this case, the court's order does not expressly prohibit Alice from requesting the court to grant physical placement in the future. However, it does condition her regaining physical placement upon: (1) seeing one of two specific therapists, (2) that therapist supporting her desire to have physical placement, (3) Shalynda's therapist's approval of that, and (4) her compliance with a step-by-step plan to work toward unsupervised visitation.[10] While there is a provision that the parties may bring their dispute to court "whenever they are unable to resolve differences in proceeding with an agreed upon permanent plan for Shalynda with her mother," that does not appear to apply to any of the four conditions just mentioned, but to a placement schedule once those four conditions have been met.

¶ 27. Melvin contends these conditions are similar to restrictions placed on physical placement, which a court has the authority to impose.[11] Melvin relies on *Lange v. Lange*, 175 Wis. 2d 373, 502 N.W.2d 143 (Ct. App. 1993). In *Lange*, we upheld a trial court order that the parent have reasonable supervised visitation, with

---

[10] These four conditions are all included in the first numbered paragraph of the six numbered paragraphs that contain the requirements for Alice regaining placement.

[11] The guardian ad litem did not file a separate brief, but joins in Melvin's brief.

the provision that the requirement of supervision could be removed when the parent showed he could visit without imposing his religious views on his children. We concluded the restriction was valid under state law because WIS. STAT. § 767.24(1) authorized the court to make "such provisions as it deems just and reasonable concerning the legal custody and physical placement" of a child; reasonableness was primarily a question of necessity and the record supported the court's implicit finding that it was necessary to protect the custodial parent's choice of religion for her children; the restriction was limited in scope; and the visiting parent had the power to terminate the restriction by showing he could visit without imposing his religious views. *See Lange*, 175 Wis. 2d at 382.

¶ 28. Had the court in this case granted Alice physical placement or visitation with restrictions, *Lange* would provide the framework for analyzing whether those restrictions were within the court's authority. However, as Alice correctly points out, the trial court in this case denied all physical contact with Shalynda. *Lange* does not address the court's authority to impose conditions for resuming placement.

¶ 29. As an alternative source of statutory authority, Melvin contends that, because under WIS. STAT. § 767.24(4)(cm) the court must give a parent denied periods of physical placement the warning provided under WIS. STAT. § 48.356, and because that warning includes both applicable grounds for termination of parental rights and "conditions necessary for the . . . parent to be granted visitation," *see* § 48.356, the trial court's order requiring treatment by one of two therapists was within its authority.[12]

---

[12] WISCONSIN STAT. § 767.24 governs legal custody and physical placement provisions in judgments of divorce, annulment,

¶ 30. The purpose of the notice required by WIS. STAT. §§ 767.24(4) and 48.356 is to inform a parent who has been denied physical placement by a court order in an action affecting the family, that if the denial of physical placement lasts at least one year, there are grounds for a termination of parental rights. *See* WIS. STAT. § 48.415(4). Because of the significant constitutional rights at stake for the parent, the legislature requires parents in such situations to be advised of potential grounds for termination of parental rights so that they are given every possible opportunity to remedy the situation. *See Winnebago County DSS v. Darrell A.*, 194 Wis. 2d 627, 639, 644–45, 534 N.W.2d 907 (Ct. App. 1995). For the same reasons, the legislature has required that parents in such situations are entitled to be informed of the conditions which they must meet in order to regain placement of the child. *See id.* at 644. Thus, once a court has properly denied phys-

---

legal separation, and custody actions, *see* § 767.24(1), and does not mention paternity actions. WISCONSIN STAT. § 767.325 applies to "modifications of legal custody and physical placement orders." Paternity actions are actions affecting the family, *see* WIS. STAT. § 767.02(1)(L), and courts are authorized to provide for periods of physical placement in paternity judgments or orders, *see* WIS. STAT. § 767.51(3). Section 767.51(6) provides that §§ 767.24 and 767.325, among other sections, "where applicable, shall apply to a judgment or order under [§ 767.51]." The trial court and the parties assume the requirement in § 767.24(4)(cm) for warnings under WIS. STAT. § 48.356 applies both when physical placement is denied under § 767.24(4) in the judgments specified in § 767.24(1), and when it is denied upon motions for revisions under § 767.325(4), even though there is no provision in § 767.325 corresponding to § 767.24(4)(cm). We assume without deciding that the requirement in § 767.24(4)(cm) does apply in this case.

ical placement to a parent because it would endanger the child's physical, emotional or mental health, the conditions it imposes for regaining placement, if those conditions are properly imposed, are not a further restriction on the parent's rights, but rather a means to enable the parent to regain placement and thus preserve their parental rights.

¶ 31. In her reply brief, Alice implicitly concedes these forgoing statutes give a court the authority to impose conditions for regaining placement, but she contends they do not authorize psychological treatment as a condition. We conclude, however, there is such authority in related provisions of WIS. STAT. ch. 48. Specifically, the report that must be prepared and presented to the court for disposition in a CHIPS case must specify the services recommended, and includes among the possible services:

> If the agency is recommending that the court order the child's parent, guardian or legal custodian or the expectant mother to participate in mental health treatment, anger management, individual or family counseling or parent or prenatal development training and education, a statement as to the availability of those services and as to the availability of funding for those services.

WIS. STAT. § 48.33(1)(f). It is therefore evident that such services could be among those that a court requires a parent to make use of as a condition of regaining or obtaining visitation in its dispositional orders under WIS. STAT. § 48.355, and, if a court did so, such services would be among the conditions contained in the warning required under WIS. STAT. § 48.356.

¶ 32. We do not find Alice's argument by analogy to WIS. STAT. § 51.61(1)(g) to be persuasive. This statute

provides that before a final commitment order under WIS. STAT. ch. 51, an individual that is the subject of such proceedings has the right to refuse medication and treatment unless it is necessary to prevent serious physical harm to the patient or others. We disagree that an order imposing treatment or counseling on a parent in order to regain physical placement is the same as preventing the parent from refusing such treatment or counseling. We also do not agree that *F.R. v. T.B.*, 225 Wis. 2d 628, 593 N.W.2d 840 (Ct. App. 1999), provides support for the proposition that the trial court lacks authority to condition regaining placement on psychological treatment. In *F.R.*, we held that WIS. STAT. § 880.155(2), which gives the court authority to grant reasonable visitation to the grandparent or stepparent in certain situations if it is in the best interests of the child, did not give the court authority to order the custodial parent to obtain psychological treatment for his child. *See F.R.*, 225 Wis. 2d at 651–52. That holding has no bearing on the question whether a court, after properly denying physical placement to a parent under WIS. STAT. § 767.325(4), has the authority to order psychological treatment as a condition of regaining placement.

¶ 33. We conclude that when a court denies a parent physical placement in an action affecting the family, it has the statutory authority to impose conditions for regaining placement, and these conditions may include mental health treatment, anger management, individual or family counseling, and parenting training. However, we agree with Alice that refusal to engage in treatment, counseling, or training under such an order has serious consequences—potential loss of parental rights. For that reason, in order to consti-

tute a proper exercise of discretion and avoid constitutional infirmities, any conditions imposed must be necessary to protect the child from the danger of physical, emotional or mental harm if the child is placed with the parent. And, following the reasoning of *Jocius*, the court may not prospectively prohibit a parent from seeking a revision to any provision in such an order. *Jocius*, 218 Wis. 2d at 117–18.

¶ 34. With this framework for analysis, we turn to the record in this case. The court gave a WIS. STAT. § 48.356 notice to Alice, and correctly understood that it had the authority and duty to consider under what conditions Alice could have placement with Shalynda that would not endanger the child's mental and emotional health. It formulated the condition first in a general way: Alice must gain an understanding of the adverse effect of her conduct on her daughter and commit herself to refraining from such conduct. As our preceding discussion has indicated, the record supports the necessity of Alice fulfilling this general condition in order to prevent endangering her daughter's mental and emotional health. And, as we have already stated, the court had the authority to impose specific conditions that would enable Alice to meet this general condition, including treatment or counseling, as long as those more specific conditions meet the same test of being necessary to prevent endangering Shalynda's mental and emotional health.

¶ 35. However, we conclude that at least some of the specific conditions imposed do not meet this standard. While the record does provide support for the implicit finding that Alice, on her own and without professional help, is not going to meet the general condition, it is not necessary that Alice be treated by one of two named therapists. And, while it might be true that

it is necessary that Alice receive treatment from persons with a particular type of professional expertise in order to make the changes necessary to regain placement, the record developed at the final hearing is not sufficient to demonstrate this.

¶ 36. Another deficiency in the conditions imposed is that, as we read them, the court appears to be limiting Alice's right to ask the court to revise certain aspects of the conditions. For example, under the court's order the only way Alice may see Shalynda at all is if both her therapist and Shalynda's therapist agree. While such a condition, with the proper evidentiary foundation, could meet the standard we have articulated above, the court may not by order prevent Alice from seeking a revision to that condition if, for example, she seeks to demonstrate that her therapist or Shalynda's is unreasonably withholding permission. However, because the parties' option of bringing a dispute to court is phrased in terms of the parties' "differences in . . . [the] agreed upon placement plan for Shalynda with her mother," it appears that the order would prevent Alice from bringing a motion seeking a revision to the conditions.

¶ 37. Because significant components of the conditions imposed for Alice to regain placement do not meet the applicable standard, we conclude that we must reverse the six numbered paragraphs that impose the conditions. In doing so, we do not suggest that all components of all the conditions are deficient, but, rather, that because significant components are, the better course is to reverse and remand all of them. At the same time, we do not suggest that the conditions we have not addressed meet the applicable standard. On remand, the court should conduct proceedings at which all parties have the opportunity to present evi-

dence and argument concerning the conditions that meet the standard we have articulated in this decision.[13]

¶ 38. We decline to use our discretionary powers of reversal under WIS. STAT. § 752.35 on the ground that the real controversy was not tried. We have already reversed the order insofar as it imposes the six numbered conditions, and there will be further proceedings on remand with respect to those. As for the court's determination to deny Alice physical placement, that matter was fully tried, and, as we have already held, the record supports the trial court's determination. We do not agree with Alice's assertion that the sixty-day time period in which her substituted counsel had to prepare, or the lack of expert testimony in her favor, indicates that the real controversy was not tried. Alice was represented by counsel throughout these lengthy proceedings. Nothing in the record indicates that the substitution of counsel was against her wishes or unfair to her in any way. There was ample opportunity for Alice, with the assistance of counsel, to obtain expert testimony on her behalf, and she has presented no evidence that there would have been such testimony to present but for circumstances beyond her control.

¶ 39. In summary, we affirm the determination that Alice have no physical placement. We reverse the six numbered paragraphs imposing conditions for her

---

[13] The joint recommendation and the court's letter adopting it used the terms "periods of placement" or "placement" throughout, but the written order entered modifies these terms with "temporary" when describing the plan to resume placement. Alice appears to attach some significance to this qualifying adjective, but we are uncertain what the court intended by it. This should be clarified on remand.

regaining placement and remand for further proceedings consistent with this opinion.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded with directions.