*In re* MARRIAGE OF MARY ELIZABETH TISCKOS/STEWART, Petitioner-Appellee, and MARTIN TISCKOS, JR., Respondent-Appellant.

Fourth District No. 4—87—0215

Opinion filed September 24, 1987.

Timothy D. Sturm, of Springfield, for appellant.

James T. Londrigan and Timothy J. Londrigan, both of Londrigan & Londrigan, of Springfield, for appellee.

JUSTICE LUND delivered the opinion of the court:

The parties' marriage was dissolved by judgment order on October 19, 1981. Custody of the parties' daughter, born January 3, 1979, was awarded to the mother, with visitation granted to the father as set forth in the dissolution judgment:

> "The Petitioner is awarded the care, custody, control and education of the minor child of the parties, Meggann Elizabeth Tisckos. The Respondent shall have visitation privileges with his daughter every other weekend, commencing with this forthcoming weekend, during the period of 6:00 p.m. on Friday to 8:00 p.m. on Sunday. Respondent in addition shall have visitation privileges on every Tuesday and Thursday evening from

the hour of 6:00 p.m. to 8:00 p.m. The Petitioner, however, shall have the minor child of the parties on every Christmas, Easter, Thanksgiving, July 4 and January 3, the birthday of the minor child. The Respondent shall have visitation privilege with the minor child on the day of the eve of Christmas, Easter, Thanksgiving, July 4 and the birthday of the said child. During the Summer months at a time mutually agreed upon by the parties hereto the Respondent shall have a total of four weeks of visitation with his minor child."

In July 1986, the respondent father filed a petition to modify the terms of the dissolution judgment, seeking (1) visitation from 4 p.m. to 8 p.m. on Tuesdays and Thursdays; (2) specification of the four weeks he requested for summer visitation; and (3) a more specific award of alternate holiday visitation.

At hearing on the petition, an issue was raised as to the daughter's attendance at religious services on weekends while in the respondent father's custody. The court entered an order modifying visitation on December 10, 1986, which included a reference to the minor's attendance at religious services during weekend visitation:

"So that the religious education and training of the minor child solely in the Roman Catholic faith shall continue, the [respondent] on his weekend visitation shall deliver the minor child of the parties to the [petitioner] at her home each Sunday by no later than 10:30 a.m. so that the minor child may attend Roman Catholic Church services at the parish church where she attends elementary school. The [respondent] thereafter at the hour of 12:15 p.m. may again obtain the child from the [petitioner's] residence for the completion of that weekend visitation. The [respondent] may, however, during his weekend visitations have the option of transporting the child each Sunday to a Roman Catholic Church to fulfill her Sunday Mass obligation rather than deliver the child to the [petitioner] each Sunday morning for the purpose. So as not to cause confusion in the mind of the said minor child regarding her religious training, the said child shall not attend any religious services other than those approved by the custodial parent, the [petitioner] herein.

During the [respondent's] uninterrupted visitation in the summer months the [respondent] shall transport the minor child each Sunday to a Roman Catholic Church so that the minor child may fulfill her Sunday Mass obligation; within reason."

This portion of the order was the focus of respondent's motion for re-

hearing, which the court denied after argument on February 24, 1987. This appeal followed.

At the inception of the hearing on respondent father's motion, counsel informed the court (1) the parties had agreed on a specific schedule for alternate holiday visitation; (2) the father's weekend visitation would continue every other weekend from 6 p.m. Friday to 6 p.m. Sunday, and terminating at 8 p.m. on Sundays when the following Monday was not a school day; and (3) weeknight visitation would be on Tuesday and Thursday evenings from 4 p.m. to 6 p.m. on nights preceding school days, and 4 p.m. to 8 p.m. at all other times. The parties remained in disagreement on the hours at which the father's weeks of summer visitation would begin and end because it involved Sundays and the issue of the minor's attendance at church services; and the mother wanted the child back for Catholic church services when the father had weekend visitation. By way of background, both the mother and father were raised in the Catholic religion; they had a Catholic church wedding; and their daughter was baptized in the Catholic church. The mother was raising the daughter in the Catholic faith. The daughter attended school at the Blessed Sacrament parish, a Catholic school, for her education during the week. The father had remarried, had a son, and had changed his religious affiliation to the Baptist faith.

Respondent was against interrupting his visitation in the middle of Sunday and testified he and his new wife and son (and his daughter during alternate weekend visitation) were involved in activities on Sunday morning from 8 a.m. to 11:15 a.m. at church and Sunday school at the Springfield Southern Baptist Church. The first service started at 8:30 a.m., finished at 9:30 a.m., and the family then went to Sunday school, which lasted until 10:45 a.m. He taught 11th and 12th graders at the Sunday school. He testified that about a year and a half earlier he spoke to Father Sotirosf at Blessed Sacrament and was told that if his daughter was prevented from attending Catholic church by an outside influence, e.g., her father, the church would not hold it against the child. Respondent testified the petitioner had not disapproved of his taking their daughter to Baptist services until the last 60 to 90 days.

The daughter's report card showed she received high marks in her subjects and showed good effort in her school work. Respondent father acknowledged that his daughter was receiving her first Sacrament of Reconciliation, or penance, within a month, and during the second grade—this school year—she would make her first Holy Communion. The respondent father acknowledged it is a mandatory re-

quirement of the Roman Catholic Church that those of Catholic faith attend Sunday mass and mass on holy days of obligation. In questioning by the court, the father stated he saw no problem in his daughter's attending church with him, since she was not being forced to become a Southern Baptist, but was simply attending with him because it was during their visitation time.

The petitioner mother called the Reverend Hugh P. Cassidy, pastor of the Blessed Sacrament parish and chief administrator of the parish school. Father Cassidy said the school tried to convey to the children the religious values of the Catholic church. He said the church considered it an obligation of Roman Catholics to attend Sunday mass and masses on holy days of obligation. Asked whether it would have any effect on a seven- or eight-year-old child if she were taken on alternate Sundays to a church of the Southern Baptist denomination, Father Cassidy said he believed it would, explaining:

"I think by virtue of the educational process, this religious educational process in which we are trying to portray and convey to a child or to children certain religious values that we feel that when a child would be going to different churches at different times, that we place the child in a dichotomy, and I think that children would be extremely confused. What are the important values and so forth, and which kind of—we feel it is counterproductive to what we are trying to convey in the educational service that we render to these children."

Father Cassidy said in addition to the Sunday morning mass at Blessed Sacrament Church, there was a Saturday evening mass at 5:30 p.m. He testified that the Catholic beliefs are more extensive than Christian principles in other Christian denominations. He further testified teachings of the Catholic church are only part of children's upbringing and they are also taught by the practice of those teachings.

The petitioner mother testified her daughter had recently begun questioning her Sunday mass obligations:

"Meggann is undergoing study right now for the Sacrament of Reconciliation and also for First Communion as are all the second graders at Blessed Sacrament, and she has come home to me on frequent occasions as well as late as last night afraid of what will happen to her *** [Objection by respondent father's counsel overruled.] *** if she is not allowed to attend mass with me.

* * *

What Meggann has expressed to me, she is learning it is a sin

if she has not received First Communion on Sunday and also if she does not attend mass, and what I have tried to relay to her is that I will try to make her attend mass with me if I can.

Q. [By father's counsel]: Well, you mentioned a conversation last night. What fear or concern was there last night?

A. [By mother]: She had visitation with her father last night because it was a Tuesday evening, and he expressed some concern to her that she did not have to attend mass because she was a minor and that the church would understand, and she came home to me and said in so many words, 'Mom, I have learned in my religion class that I am supposed to attend mass and—which is the truth.' "

The mother said she would take the child at 8 or 8:30 in the morning on Sundays if the respondent father needed to go to his church services earlier, and he could pick the child up at 12:15 p.m.

Respondent father's counsel argued the question before the court was whether the father's visitation should be *interrupted*; it was conceded the standard for this determination was the best interests of the child. Petitioner mother's counsel argued that although the child's attending different churches on alternating Sundays had not been a problem when she was younger, it was now confusing the child because of her age and the stage of her religious training.

The court ruled that if the respondent father was willing to take his daughter to a Roman Catholic church on the days she is obligated to go to church, he may do so and his visitation would not be interrupted; but if he did not wish to do so, he would advise his former wife and work out a time with her when he would drop the child off at her residence to take the child to Catholic church services, and he could pick the child up thereafter. In making the ruling, the court stated:

"Your daughter is learning concepts that she will have to live with for the rest of her life. Some day she may make the decision as you have and want to be a Southern Baptist, want to be an atheist, want to be a Jew, a Moslem or whatever. When she is an adult, she is a mature person, she like all of us has to make those decisions for herself, but I think you're asking her to take on too much as a seven year old to practice one religion and every other Sunday another religion on your Sundays when the one religion feels that that is inappropriate and *that is the religion of her mother who has custody of her and is in charge of her upbringing.*" (Emphasis added.)

The language of the court's written order was set forth above.

The respondent father filed a motion for rehearing of the "religious issues," arguing (1) the judge was biased because of his own religious beliefs and personal background, and should have recused himself; (2) no evidence of present or future harm was presented; and (3) the court's order interfered with his visitation rights, violating the establishment clause and the first amendment's free exercise clause. On February 24, 1987, after hearings and argument, the court denied the motion.

On appeal, respondent first argues his visitation rights have been improperly restricted by the provisions of the court's order which (1) addressed the minor's Catholic mass obligation during his weekend and summer visitation periods, and (2) ordered him not to take her to church services other than those approved by the custodial parent. (See generally Annot., *Religion as Factor in Child Custody and Visitation Cases*, 22 A.L.R.4th 971 (1983); *Hanson v. Hanson* (N.D. 1987), 404 N.W.2d 460 (and cases cited therein).) He bases his argument on (1) the court's use of the best-interest test; and (2) the fact that the court did not make findings that the child's physical, mental, moral, or emotional health would be endangered. Section 607(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1985, ch. 40, par. 607(c)) provides:

> "The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health."

■■ The issue in this case raises the interpretation to be given related statutory provisions of the Act—the noncustodial parent's visitation rights under section 607(c) of the Act, and the custodial parent's rights under section 608(a) of the Act (Ill. Rev. Stat. 1985, ch. 40, par. 608(a)). Section 608(a) provides:

> "Except as otherwise agreed by the parties in writing at the time of the custody judgment or as otherwise ordered by the court, *the custodian may determine the child's upbringing, including* but not limited to, *his education*, health care *and religious training*, unless the court, after hearing, finds upon motion by the noncustodial parent, that the absence of a specific limitation of the custodian's authority would clearly be contrary to the best interests of the child." (Emphasis added.)

Generally, the party seeking to increase or otherwise modify visitation rights originally granted by the dissolution decree (here, the noncustodial parent) bears the burden of showing such alteration is in the

best interests of the child. (*Coons v. Wilder* (1981), 93 Ill. App. 3d 127, 131, 416 N.E.2d 785, 790 (and cases cited therein).) An order on a petition for modification of custody is addressed to the sound discretion of the trial court and will not be overturned on review absent an abuse of discretion. (*Gibson v. Barton* (1983), 118 Ill. App. 3d 576, 580, 455 N.E.2d 282, 285 (and cases cited therein).) Section 608(a) is specific that, except under circumstances inapplicable here, the custodial parent may determine the child's education and religious training. This statutory subsection speaks in terms of a single custodian with substantial authority. (See *In re Marriage of Manuele* (1982), 107 Ill. App. 3d 1090, 1094, 438 N.E.2d 691, 694.) This court recognized in *Manuele* that unless the parents have unusual capacity to cooperate, when the vestige of authority in the parent not having physical custody is not specific, substantial bickering and dispute, damaging to the children and harassing to the parent with physical custody, is likely to result. Section 608(a) was intended to help reconcile the conflicting interests of estranged parents. (*In re Marriage of Manuele* (1982), 107 Ill. App. 3d 1090, 1095, 438 N.E.2d 691, 694, citing Ill. Ann. Stat., ch. 40, par. 608(a), Historical & Practice Notes, at 81 (Smith-Hurd 1980).) We note also that, although in a different context (based on the custodial parent's right to determine the health care of the child under section 608(a) and absent any applicable limitation under the statutory subsection on that authority), the First District Appellate Court in *Dymek v. Nyquist* (1984), 128 Ill. App. 3d 859, 864-65, 469 N.E.2d 659, 664-65, found a cause of action existed when a psychiatrist treated a child at the request of the noncustodial parent and without the consent of the custodial parent.

■■ ■ Only if the provisions of the court's order in question are deemed a "restriction" of the noncustodial parent's visitation rights does the endangerment standard come in to play. The word "restrict," given its ordinary and everyday meaning, indicates action to limit, restrain, or confine within bounds. (See *Gibson v. Barton* (1983), 118 Ill. App. 3d 576, 580, 455 N.E.2d 282, 284; *In re Marriage of Anderson* (1985), 130 Ill. App. 3d 684, 688, 474 N.E.2d 911, 914 (and cases cited therein).) "Restrictions" have been found to include a prohibition of overnight visitation (see *Crichton v. Crichton* (1979), 75 Ill. App. 3d 326, 393 N.E.2d 1319); a requirement that visitation occur in the custodial parent's home, or outside the home of the noncustodial parent (*Gibson v. Barton* (1983), 118 Ill. App. 3d 576, 580, 455 N.E.2d 282, 284-85; *In re Marriage of Lawver* (1980), 82 Ill. App. 3d 198, 402 N.E.2d 430); or the requirements that summertime visitation exclude overnight visitation and weekend visitation be supervised (*In*

*re Marriage of Anderson* (1985), 130 Ill. App. 3d 684, 687, 474 N.E.2d 911, 913). Only when there is such a restriction of visitation rights does the endangerment standard govern and mandate the requisite findings under that standard. *In re Marriage of Anderson* (1985), 130 Ill. App. 3d 684, 687-88, 474 N.E.2d 911, 913-14; *In re Marriage of Hanson* (1983), 112 Ill. App. 3d 564, 568-69, 445 N.E.2d 912, 915-16.

■ Given the context of this case and the terms of the court's order modifying visitation, we conclude its terms did not amount to a "restriction" of the respondent father's visitation rights within the meaning of section 607(c) of the Act. Rather, it is in the nature of *an accommodation to be made on behalf of the child by the noncustodial parent*, and involves the noncustodial parent to a degree when the child's obligation occurs during a period of visitation. To the extent that the accommodation is one of religious differences between the custodial parent and child of one faith and noncustodial parent of another faith, section 608(a) governs. This result is dictated both by logic and a commonsense construction of the statutory provisions involved, given a petition to modify a visitation order under section 607(c) of the Act placing at issue matters section 608(a) of the Act expressly designates as within custodial parent's authority. We therefore reject the respondent father's argument that his visitation rights have been improperly restricted by the court's order modifying visitation. The trial court properly applied the best-interests-of-the-child standard and the ruling was within the sound discretion of the trial court.

■ The respondent father next argues the court's order, insofar as it directed him as noncustodial parent to take his daughter to the Roman Catholic church and not to his Baptist church, violated the first amendment and his rights thereunder to the free exercise of religion (U.S. Const., amend. I). He cites various decisions from the courts of other States, including *Brown v. Szakal* (1986), 212 N.J. Super. 136, 144, 514 A.2d 81, 85, wherein the court stated on the facts of that case it could not impose upon the noncustodial parent, the father, the affirmative obligation of observing the laws of his children's religion when he visits with them. Suffice it to say the trial court's order in the instant case does not require the respondent father to observe the laws of the Roman Catholic church, but only (1) to make transportation arrangements for his seven-year-old daughter to fulfill her religious obligation when it falls during his visitation periods; and (2) not take the daughter to religious services other than those approved by the custodial parent. We find nothing in the order which would violate the respondent father's first amendment rights to the

free exercise of his religion. Rather, the order was clearly directed to the accommodation to be made in the child's best interests, given that the custodial parent, under section 608(a), has the right to direct the educational and religious training of the child, which in this case was in the Roman Catholic faith.

■■ ■ We find it unnecessary to distinguish the out-of-State cases cited by respondent. The precedential scope of a decision is limited to the facts before the court (*People v. Flatt* (1980), 82 Ill. 2d 250, 261, 412 N.E.2d 509, 515), and is authority only for what is actually decided (*Board of Governors of State Colleges & Universities v. Illinois Fair Employment Practices Com.* (1979), 78 Ill. 2d 143, 399 N.E.2d 590). Even when there are decisions from the courts of other States interpreting similar statutes, it is a well-recognized rule of statutory construction that the interpretation placed upon a statute need not be followed by the courts of another State, even where it has adopted the same statute, where such an interpretation is inconsistent with the policy of the adopting State. (*A. E. Staley Manufacturing Co. v. Swift & Co.* (1980), 84 Ill. 2d 245, 250, 419 N.E.2d 23, 26, citing 2A A. Sutherland, Statutes & Statutory Construction sec. 52.02, at 330 (4th ed. 1973).) Some of the cases cited by respondent involved petitions brought by the custodial parent, and all were decided on the facts of the cases, with review based on the facts and on the wording of the orders on appeal.

■■■ The respondent father next argues the court's order modifying visitation violated the establishment clause of the first amendment (U.S. Const., amend. I). A similar argument was discussed by the Fifth District in *In re Marriage of Zucco* (1986), 150 Ill. App. 3d 146, 154, 501 N.E.2d 875, 877, in the context of the trial court's consideration of the parties' religious beliefs in determining custody. *Zucco* stated the applicable standard as follows:

"The establishment clause of the first amendment (U.S. Const., amend. I) prohibits State and Federal action 'favoring the tenets or adherents of any religion or of religion over nonreligion.' (*McDaniel v. Paty* (1978), 435 U.S. 618, 638, 55 L. Ed. 2d 593, 608, 98 S. Ct. 1322, 1334 (Brennan, J., concurring).) In determining whether governmental action offends the establishment clause, a court must apply the tripartite test established by *Lemon v. Kurtzman* (1971), 403 U.S. 602, 29 L. Ed. 2d 745, 91 S. Ct. 2105. That test requires: (1) that the action have a secular purpose, (2) that its principal or primary effect neither advances nor inhibits religion, and (3) that it does not foster an excessive entanglement with religion. (403 U.S.

602, 612-13, 29 L. Ed. 2d 745, 755, 91 S. Ct. 2105, 2111.)" 150
Ill. App. 3d 146, 154, 501 N.E.2d 875, 877.

We find the order in this case did not violate the test stated by the United States Supreme Court in *Kurtzman*; nor did it favor the tenets of any religion or of religion over nonreligion.

■■■ The respondent father next argues the trial judge should have recused himself from this case, as his personal childhood experience led to the "restriction" on the respondent's visitation, and asks this court to reverse those portions of the order which address religion. In support of his argument, respondent quotes a remark the trial judge made in discussing the facts and evidence in this case:

> "On a personal note, my father was never a Roman Catholic. He was a Baptist. My mother was always and still is a Roman Catholic, and my parents got divorced twice, and my father used to walk up to the Catholic Church and take me away from it at the age of ten and twelve, so I couldn't go to church because he thought it was bad for me to go, and so when it was on his Sunday he wasn't going to let me, and somehow that never got back into Court I was never asked this, and I know it was never brought to the Court's attention."

At hearing on February 18, 1987, on the respondent's motion for rehearing, the trial judge addressed the allegation that he should have recused himself from the case when he learned the factual circumstances and religions involved were similar to his personal background and circumstances. The trial judge said he had not decided the case on the basis of personal prejudice or background and declined to recuse himself. The judge further commented he would have more trouble thinking he was being fair and impartial if he had kept the matter to himself, whereas he made the above comment simply as a fact.

To conclude that a judge is disqualified because of prejudice is not, of course, a judgment to be lightly made. (*People v. Vance* (1979), 76 Ill. 2d 171, 179, 390 N.E.2d 867, 870.) As stated in *Vance*, the most that ought to be expected is that the judge will recognize that he has basic predilections and make a conscientious effort to set them aside and give dispassionate consideration to the case before him. (76 Ill. 2d 171, 179, 390 N.E.2d 867, 871.) *Vance* stated that reviewing court judges should be chary of condemning as motivated by prejudice those actions of trial judges which may represent only a difference of opinion; rather, it is that "something more"—a showing of animosity, hostility, ill-will, or distrust toward a particular party—which must be present. In its absence, the proof falls short of establishing the *actual prejudice* which would interfere with a fair determination of a party's

case. (76 Ill. 2d 171, 181-82, 390 N.E.2d 867, 871-72.) On review of the record as a whole, we find the trial judge's comment was made in passing, and was not reflective of such bias or other personal belief as to require recusal.

Affirmed.

GREEN and KNECHT, JJ., concur.