**In re the MARRIAGE OF Rebekah G. McSOUD, Appellant,**

and

**Joseph McSoud, Appellee.**

No. 04CA2682.

Colorado Court of Appeals,
Div. V.

Feb. 9, 2006.

Litvak, Litvak, Mehrtens & Epstein, Steven B. Epstein, Denver, Colorado, for Appellant.

McGuane & Hogan, LLP, Kathleen A. Hogan, Denver, Colorado, for Appellee.

WEBB, J.

In this dissolution of marriage proceeding, Rebekah G. McSoud (mother) appeals from the permanent orders allocating parental responsibilities; from the order denying her motion for relief under C.R.C.P. 59 and 60; and from the order denying her C.R.C.P. 97 motion to disqualify the court. We affirm in part, reverse in part, vacate in part, and remand with directions.

Mother and Joseph McSoud (father) are the parents of one child. Mother petitioned for dissolution of the marriage in 2001. Following a hearing on permanent orders in January 2004, the court allocated decision-making responsibilities relating to the child's religious upbringing and medical care to father, ordered that all other decisions should be shared by the parties, and increased father's parenting time. In March 2004, mother sought relief under C.R.C.P. 59 and 60, and sought also to disqualify the judge. The trial court declined to recuse and then denied the motion for relief under C.R.C.P. 59 and 60.

## I. Deficiencies in the Record

We first address mother's contentions that deficiencies in the record deprive her of meaningful appellate review and that because of such deficiencies the trial court erred or abused its discretion in denying her motion for a new trial under C.R.C.P. 59 and 60. We discern neither error nor abuse of discretion.

In March 2004, shortly after entry of the permanent orders at issue, mother discovered that a transcript of a portion of the January 2004 hearing was not available because the recording equipment had malfunctioned. Instead of attempting to reconstruct the record, she moved for a new trial, alleging that it would be "impossible to reconstruct the proceedings from recollection with any degree of accuracy or to the satisfaction of both

[mother] and [father]." The court denied the motion, noting that the unavailability of a transcript is to be remedied under C.A.R. 10(c).

### A. C.A.R. 10

We first consider and reject mother's contention that because a complete transcript cannot be reconstructed from recollection with any degree of accuracy or to the parties' satisfaction, the procedure set forth in C.A.R. 10(c) is inadequate to protect her due process right to a meaningful appellate review.

If a transcript is unavailable, the appellant may prepare a statement of the proceedings from the best available means, including recollection. The appellee may serve objections or propose amendments to the statement within ten days after service. The statement and any objections or proposed amendments shall then be submitted to the trial court for settlement and approval and, as settled and approved, shall be included in the record on appeal. C.A.R. 10(c). If any difference arises as to whether the record accurately discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. C.A.R. 10(e).

The party prosecuting an appeal is obligated to take all steps necessary under the appellate rules to obtain the necessary record for review. Reconstruction may not be an appropriate remedy for a missing transcript if testimony is in dispute and the exact language used is crucial. *People v. Jackson*, 98 P.3d 940 (Colo.App.2004).

But if a party fails to attempt to reconstruct the record as required by C.A.R. 10(c) and (e), that party may not thereafter complain that the record is inadequate. *Halliburton v. Pub. Serv. Co.*, 804 P.2d 213 (Colo.App.1990). Federal courts have interpreted the analogous federal rule similarly. *See, e.g., United States v. Burns*, 104 F.3d 529 (2d Cir.1997); *In re Ashley*, 903 F.2d 599 (9th Cir.1990).

Here, because mother has made no attempt to comply with C.A.R. 10(c) and (e), we are unable to evaluate her claim that accu-

rately reconstructing the record would be impossible. Accordingly, we conclude that she cannot be heard to say the record is inadequate to protect her right to a meaningful appellate review.

## B. C.R.C.P. 59

Mother next contends the lack of a transcript constitutes both an "irregularity in the proceedings" and an "accident or surprise" to her, and thus the trial court erred in failing to order a new trial under C.R.C.P. 59(d)(1) and (3). We disagree.

■ Within fifteen days of entry of judgment as provided in C.R.C.P. 58 or such greater time as the court may allow, a party may move for post-trial relief under C.R.C.P. 59. C.R.C.P. 59(a). The court may in its discretion extend the time period for filing such a motion, but the extension must be sought before the time period for filing the motion under C.R.C.P. 59 has expired. *Austin v. Coll./Univ. Ins. Co.*, 30 Colo.App. 502, 495 P.2d 1162 (1972).

■ Failure to file the motion within the time allowed by C.R.C.P. 59(a), or within the time allowed by the court in response to a timely filed motion for extension of time, deprives the court of jurisdiction to act under C.R.C.P. 59. *People v. Albaugh*, 949 P.2d 115 (Colo.App.1997).

Here, the permanent orders at issue were entered on February 12, 2004. On March 30, mother filed a motion for a new trial under C.R.C.P. 59 and for relief under C.R.C.P. 60. Mother also requested an extension of time for seeking C.R.C.P. 59 relief. The trial court denied mother's motion for an extension of time as untimely, and then denied the C.R.C.P. 59 motion as untimely.

On appeal, mother does not argue that the trial court erred in rejecting her C.R.C.P. 59 motion as untimely. Thus, we conclude that she has abandoned the timeliness issue. *See Buckhannon v. U.S. W. Communications Inc.*, 928 P.2d 1331 (Colo.App.1996).

## C. C.R.C.P. 60(a)

Mother next contends the lack of a complete transcript constitutes a "clerical error"

that may be corrected under C.R.C.P. 60(a), and thus the trial court abused its discretion in failing to order a new trial for this purpose. We disagree.

Clerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. C.R.C.P. 60(a).

■ Correction of clerical errors under C.R.C.P. 60(a) is a matter within the discretion of the trial court. *McNeill v. Allen*, 35 Colo.App. 317, 534 P.2d 813 (1975). A trial court abuses its discretion when it acts in a manifestly arbitrary, unfair, or unreasonable manner. *In re Marriage of Page*, 70 P.3d 579 (Colo.App.2003).

In other jurisdictions, courts have allowed errors in the record to be corrected if the party seeking correction can show that, as a result of clerical error, the record does not accurately reflect particular proceedings. *See, e.g., Crye v. Edwards*, 178 Ariz. 327, 873 P.2d 665 (Ariz.Ct.App.1993)(where the record did not show that a critical document had been filed on the date claimed, but evidence supported the party's claim that the document had been submitted to the clerk on that date, court could correct the error as clerical).

Here, mother did not seek to correct the record to reflect the proceedings at the January 2004 hearing. Rather, she requested a new hearing. The trial court denied the motion on the basis that equipment failure resulting in the lack of a complete transcript was not a clerical error as contemplated by C.R.C.P. 60(a). The court again noted that unavailability of a transcript could be remedied under C.A.R. 10(c).

Mother has provided us with no authority supporting her argument that an incomplete transcript can be "corrected" in this manner, and we are aware of none. Hence, we conclude that the court did not abuse its discretion in denying mother's request for relief pursuant to C.R.C.P. 60(a).

### D. C.R.C.P. 60(b)

Mother next contends the trial court erred in finding that she was not seeking relief under C.R.C.P. 60(b). We do not agree.

In her "motion for new trial pursuant to C.R.C.P. Rules 59 and/or 60," mother asserted that a new trial should be available to her pursuant to C.R.C.P. 60(b)(5). Father responded that a C.R.C.P. 60 motion is not a substitute for an appeal. In her reply, mother stated that she "is not seeking relief under Rule 60(b)."

We conclude that, by stating she did not intend to seek relief under C.R.C.P. 60(b), mother abandoned this claim.

### E. Law of the Case

Mother further contends the trial court's denial of her new trial motion violated the law of the case because the court had established a procedure for resolving a missing transcript. Again, we disagree.

The law of the case doctrine is a discretionary rule that generally requires prior relevant rulings made in the same case to be followed. It applies to decisions of law, rather than to the resolution of factual questions, and discourages reconsideration only of the ruling itself, not of a court's preliminary opinion on questions of fact or law related to the ruling. *DeForrest v. City of Cherry Hills Village*, 990 P.2d 1139 (Colo.App.1999).

Here, in July 2004, before ruling on mother's motion for a new trial, the court learned that the record of the April 20, 2004, hearing on financial issues also could not be transcribed. In an "order regarding perfection of the record of the April 20, 2004 proceedings," the court offered the parties the option of recalling the witnesses who had testified that day. Nearly four months later, the court rejected mother's request for a new trial on the parental responsibilities issues, in which she had argued that she should have been afforded a similar opportunity to recall witnesses with respect to that hearing.

Mother now asserts that in offering the parties the option of recalling the witnesses who had testified at the financial issues hearing, the court established a "procedural precedent" for resolving the problem of missing transcripts; that this procedural precedent constituted the law of the case; and that the court violated the law of the case doctrine when it denied her motion for a new trial. We are not persuaded.

First, mother has cited no authority, and we are aware of none in Colorado, for the proposition that a "procedural precedent" triggers "law of the case" consequences.

Second, the two circumstances in which the court addressed the missing transcript problem differ. Lack of a complete transcript of the January 20, 2004, hearing was discovered only after the court had issued permanent orders on parental responsibilities. Thus, recalling the witnesses and retaking their testimony would have also required reconsideration of an order already issued. In contrast, the lack of a transcript of the April 20, 2004, hearing was discovered before the court issued permanent orders on financial issues. Under these circumstances, we conclude that the court did not abuse its discretion in treating the two transcript problems differently.

In sum, we conclude that mother has not been denied due process, and we perceive no abuse of discretion in the court's refusal to order a new trial.

### II. Allocation of Medical Decision–Making

■ Mother contends the trial court abused its discretion in divesting her of decision-making authority relative to medical issues. To the extent the court divested mother of some but not all such authority, we discern no abuse of discretion.

Under § 14–10–124(1.5), C.R.S.2005, the court must allocate parental responsibilities, including decision-making responsibilities, in accordance with the best interests of the child. In making this determination, the court must consider all relevant factors, including those set forth in § 14–10–124(1.5)(a), C.R.S. 2005, and, for allocation of decision-making responsibilities, those set forth in § 14–10–124(1.5)(b), C.R.S.2005. One factor is the parties' ability to cooperate and to make decisions jointly. Section 14–10–124(1.5)(b)(I), C.R.S.2005.

Allocating parental responsibilities is a matter within the sound discretion of the trial court. *People in Interest of A.M.K.*, 68 P.3d 563 (Colo.App.2003).

Here, the parties had agreed to share decision-making before entry of permanent orders, but experienced difficulty doing so. The special advocate advised the court that the parties were "utterly incapable of listening to one another" and recommended that they not share decision-making with respect to medical care and religion, both areas in which particularly serious disputes had arisen. A disagreement regarding routine immunizations for the child was sufficiently severe and prolonged that a court hearing had been scheduled to resolve it, although the parties reached an agreement before the hearing.

The court concluded that shared decision-making regarding medical care was not in the child's best interests. Citing the special advocate's finding that providing medical care consistently and under the advice of a qualified physician was in the child's best interests and that father was more likely to follow such advice, the court allocated decision-making responsibility for the child's medical care to father. However, the order also provided that "[e]xcepting exigent circumstances involving medical emergencies, the parties are to jointly confer with health care providers regarding the health care needs and treatment of [the child], and to inform one another immediately upon the onset of any health care issue or need of [the child]."

The court's order allocating decision-making responsibility for the child's medical care to father is supported by the record, and we conclude that the terms of the order are reasonable. Accordingly, we perceive no abuse of discretion.

### III. Religion and Parental Rights

Mother contends the trial court erroneously applied § 14–10–124, C.R.S.2005, and violated her rights under the First and Fourteenth Amendments to the United States Constitution and article II, § 4 of the Colorado Constitution, by restricting her influence on the child's religious upbringing. Alterna-

tively, she contends that, if the court did not err in applying the statute, then § 14–10–101, et seq., C.R.S.2005, is unconstitutional as applied to her because it violates her right to raise her child in a manner protected by the First and Fourteenth Amendments. She further contends that the trial court erred in admitting evidence of religious practices which did not endanger the child.

We conclude that insofar as the permanent orders adopt the special advocate's recommendation restricting mother's right to take the child to her church, unless she supports the religion chosen by father for the child, they are unconstitutional. With respect to portions of the orders that subject the child's religious upbringing to other recommendations of the special advocate, we remand for further findings on a compelling state interest. We do not address the statute's constitutionality and we discern no evidentiary error.

### A. Issues Preserved for Appeal

Initially, we reject father's assertion that the constitutional protection of religious liberty is not properly before us because mother failed to raise the issue below.

◼︎ Arguments not presented to the trial court may not be raised for the first time on appeal. *Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718 (Colo.1992).

Here, during the permanent orders hearing, mother argued that conditioning her right to take the child to her Protestant church on her agreement to allow the child to participate in Catholic activities during her parenting time was unconstitutional.

Hence, we conclude that this constitutional issue is properly before us. We proceed to examine it guided by three broad principles:

- "by remaining neutral with respect to the religious beliefs of its people, government ensures that all individuals may worship freely or not at all." *State v. Freedom From Religion Found., Inc.*, 898 P.2d 1013, 1029 (Colo.1995);
- "intervention in matters of religion is a perilous adventure upon which the judiciary should be loath to embark." *Wo-*

jnarowicz v. Wojnarowicz, 48 N.J.Super. 349, 354, 137 A.2d 618, 621 (1958); and,

- "[c]hild parenting disputes present agonizing decisions for trial judges." *In re Marriage of Ciesluk*, 113 P.3d 135, 147 (Colo.2005).

## B. Religious Education

Mother asserts that the trial court misapplied § 14–10–124 and violated her constitutional rights by giving father sole decision-making authority as to the child's religion and adopting recommendations of the special advocate that restrict her from providing religious education for her child. We agree in part.

### 1. Standard of Review

We review the legal standard applied by the trial court de novo. *See People in Interest of J.R.T.*, 55 P.3d 217 (Colo.App.2002), *aff'd sub nom. People v. Martinez*, 70 P.3d 474 (Colo.2003).

The right of all citizens freely to pursue their religious beliefs is guaranteed by the Free Exercise Clause of the First Amendment of the United States Constitution, as applied to the states through the Due Process Clause of the Fourteenth Amendment, and by article II, § 4 of the Colorado Constitution. *In re Marriage of Short*, 698 P.2d 1310 (Colo.1985). The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. It also includes performing (or abstaining from) physical acts, such as assembling with others for a worship service, proselytizing, or observing dietary restrictions. *Employment Div. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

■ Parents have a fundamental right to make decisions concerning the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). A parent's right to determine the religious upbringing of a child derives from the parent's right both to exercise religion freely and to the care, custody, and control of a child. *See, e.g., Wisconsin v.* *Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

The right of a parent with decision-making authority to determine the religious upbringing of the child has been recognized in Colorado. *In re Marriage of Oswald*, 847 P.2d 251 (Colo.App.1993).

■ Although this issue has not yet been addressed in Colorado, courts in most other states have also recognized that, absent a clear showing of substantial harm to the child, a parent who does not have decision-making authority with respect to religion nevertheless retains a constitutional right to educate the child in that parent's religion. *See In re Marriage of Murga*, 103 Cal. App.3d 498, 163 Cal.Rptr. 79 (1980)(citing cases); *Zummo v. Zummo*, 394 Pa.Super. 30, 574 A.2d 1130 (1990)(citing cases); *see generally* Kevin S. Smith, *Religious Visitation Constraints on the Noncustodial Parent: the Need for National Application of a Uniform Compelling Interest Test*, 71 Ind. L.J. 815 (1996). *But cf. In re Marriage of Andros*, 396 N.W.2d 917 (Minn.App.1986); *Lange v. Lange*, 175 Wis.2d 373, 386, 502 N.W.2d 143, 148 (Wis.Ct.App.1993)("The health of the children is an outrageous price for [protecting the right of the decision-making parent] . . . . It is grossly unfair because the children ultimately bear it. No United States Supreme Court decision has authorized it.").

In *Munoz v. Munoz*, 79 Wash.2d 810, 489 P.2d 1133 (1971), for example, the court concluded that where no evidence supported a finding that exposure to two religious beliefs had had or would have any adverse effect on the children, the trial court's order prohibiting a noncustodial father from taking his children to his church or to instructional classes sponsored by that church was an abuse of discretion. *See also In re Marriage of Murga, supra* (rejecting a custodial mother's claim that she had an absolute right to direct the child's religious upbringing and holding that, absent a clear, affirmative showing that the noncustodial parent's religious activities would harm the child, the noncustodial parent could not be restrained from exposing the child to his or her religious beliefs and practices). We find the

majority view well-reasoned and adopt it here.

■ Despite each parent's right to expose the child to his or her own religion, we also agree with courts that have found the harm caused by one parent's disparagement of the other's religion or of the child's religion may justify a limitation on that parent's right to religious education of the child.

In *Kendall v. Kendall*, 426 Mass. 238, 687 N.E.2d 1228 (1997), for example, legal custody of three children was shared between an orthodox Jewish mother and a father who had joined a fundamentalist Christian church. At the mother's request, the trial court agreed that limits should be imposed on the father's right to indoctrinate the children in the tenets of his new faith, which included a belief that all who did not accept that faith were "damned to go to hell." The Massachusetts Supreme Judicial Court upheld the restriction, concluding that the harm to the children was sufficiently substantial to warrant a limitation on the father's religious freedom. *See also In re Marriage of Jensen–Branch*, 78 Wash.App. 482, 899 P.2d 803 (1995)(father could be prohibited from educating children in his religious beliefs that certain holidays observed by mother's religion were pagan, upon substantial showing of actual or potential harm to the children).

■ Governmental interference with the constitutional rights of a fit, legal parent is subject to strict scrutiny. Thus, a legislative enactment or other state action, such as a parental responsibilities order, that infringes on such a constitutional right is permissible only if it is necessary to promote a compelling state interest and does so in the least restrictive manner possible. *See In re Marriage of Ciesluk, supra; In Interest of E.L.M.C.*, 100 P.3d 546 (Colo.App.2004). This is particularly so as to religious liberty. *See Wisconsin v. Yoder, supra*, 406 U.S. at 215, 92 S.Ct. at 1533 ("The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.").

*Employment Division v. Smith, supra*, does not suggest a less rigorous standard of review. There, Smith raised a First Amendment challenge to a neutral, generally applicable law disallowing unemployment compensation benefits because of drug use. The Supreme Court held that a compelling state interest need not be shown, even if application of the law had a collateral effect on religious practices involving drugs. But the Court also noted that a lower standard of review had not been approved in cases which involved the Free Exercise Clause in conjunction with other constitutional protections, such as the right of parents to educate their children. Because the case before us involves both the Free Exercise Clause and a parent's fundamental right to the care, custody, and control of a child, we adhere to the strict scrutiny test.

Yet even under this test, the family "is not beyond regulation in the public interest as against a claim of religious liberty, and neither the rights of religion nor rights of parenthood are beyond limitation." *In re Marriage of Short, supra*, 698 P.2d at 1312. Limitations on a parent's fundamental right to control a child's upbringing arise out of the state's interest as parens patriae (parent of the country). As parens patriae, a state has a compelling interest in guarding children against substantial physical or emotional harm.

■ Thus, proof that a fit parent's exercise of parental responsibilities causes actual or threatened physical or emotional harm to a child establishes a compelling state interest sufficient to permit state interference with parental rights. *In re E.L.M.C., supra*. But not every type or degree of actual or threatened physical or emotional harm will suffice; to constitute a compelling state interest the harm must be "substantial." *In re R.A.*, 121 P.3d 295 (Colo.App.2005)(*cert. granted* Oct. 3, 2005, 2005 WL 2417058).

■ In this regard, we adopt the view that "harm to the child from conflicting religious instructions or practices, which would justify such a limitation, should not be simply assumed or surmised; it must be demonstrated in detail." *Felton v. Felton*, 383 Mass. 232, 233, 418 N.E.2d 606, 607 (1981);

*see also Hanson v. Hanson,* 404 N.W.2d 460, 465 (N.D.1987)(requiring a "clear and affirmative showing of physical or emotional harm to the children" to justify religious restrictions on visitation rights); *Zummo v. Zummo, supra,* 394 Pa.Super. at 79, 574 A.2d at 1155 ("[T]he speculative possibility of mere disquietude, disorientation, or confusion arising from exposure to 'contradictory' religions would be a patently insufficient 'emotional harm' to justify encroachment by the government upon constitutional parental and religious rights of parents, even in the context of divorce.").

We also agree with those courts that have found merely exposing a child to a second religion need not be harmful, and indeed may be healthy for the child. *See, e.g., Smith v. Smith,* 90 Ariz. 190, 367 P.2d 230 (1961)(noting a value in letting a child see the religious models between which a choice will likely be made later in life, and that a diversity of religious experience could be beneficial to the child); *Felton v. Felton, supra* (same); *Munoz v. Munoz, supra* (expressing doubt that duality of religious beliefs, per se, creates a conflict in children's minds).

■■■ In *In re Marriage of Ciesluk, supra,* which was announced after the trial court's decision in this case, the Colorado supreme court considered the best interests of the child standard in resolving a conflict between the constitutional right to travel of a majority time parent who wished to relocate out-of-state, and the constitutional right of the other parent to ongoing care, custody, and control of the child. The court concluded that, "in the absence of demonstrated harm to the child, the best interests of the child standard is insufficient to serve as a compelling state interest overruling the parents' fundamental rights." *In re Marriage of Ciesluk, supra,* 113 P.3d at 145; *see also In re E.L.M.C., supra,* 100 P.3d at 558 ("every ruling on parental responsibilities that protects a child from harm also furthers the child's best interests," but "not all best interests determinations are necessary to avoid harm").

Although *In re Marriage of Ciesluk, supra,* did not address a parent's constitutional rights as to religious upbringing of the child, we conclude that its limitation on the best

interests standard should be applied to this aspect of the parental responsibilities order before us. The constitutional right to travel finds no express mention in the U.S. Constitution, *Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), whereas religious liberty is guaranteed by the First Amendment. If the best interest standard cannot overcome the constitutionally implied right to travel, then we must conclude it cannot overcome the express constitutional right to freedom of religion. *See also Zummo v. Zummo, supra,* 394 Pa.Super. at 54, 574 A.2d at 1142 ("When [the best interest standard] is applied in the context of religious upbringing disputes, it may also encroach impermissibly upon constitutionally protected religious freedoms.").

Here, adoption of the special advocate's recommendations in the permanent orders not only affects mother's rights with respect to the religious upbringing of her child, they also interfere with her own rights under the Free Exercise Clause. Because the court did not discuss a compelling state interest, and instead relied on the best interests test, we remand a portion of the permanent orders for further findings in light of our extension of *In re Marriage of Ciesluk, supra,* to religious upbringing issues.

To the extent that, on remand, the court goes beyond allocating sole decision making over the child's religious upbringing and otherwise restricts either parent's right to expose the child to that parent's religious beliefs or to practice that parent's religion, the court must find a compelling state interest in the form of avoiding substantial emotional or physical harm to the child.

#### 2. Application

Here, the special advocate recommended that the parties not share decision-making with respect to the child's religious upbringing because shared decision-making in that area was "in all likelihood, impossible." She advised the court that the parties had agreed to raise the child in the Catholic faith when he was baptized, but that mother had later demonstrated a "lack of respect" for the religion chosen for the child, stating that she

"[did]n't want him inundated with Catholicism."

In her report, the special advocate recommended that:

- decision-making responsibility for the child's religion be allocated to father, subject to the commitment to raise the child in the Catholic faith;
- the child "should not be given mixed messages by either parent . . . about his religion."
- responsibility for taking him to Catholic activities should be borne by "the parent caring for [the child] at that time"; and
- "[m]other should be allowed to continue to take him to her church during her parenting time if she wishes, but only so long as she supports his participation and attendance at church with [f]ather as well."

At the permanent orders hearing, the special advocate testified to concern that the child had received some "mixed messages" about his religion, such as being told, "If you're Catholic you're not a Christian and you're going to hell." Although she did not identify mother as the source of that statement, she proposed that mother be allowed to take the child to her own church "unless she's disparaging father's religion" because the special advocate wanted to help the court find a way to impose consequences on mother's unwillingness to recognize the child's Catholic faith. She did not recommend limiting the parents' religious practices, but opined that one parent's "bad mouthing" of the other's religion "could be endangering to the child emotionally."

Mother's attorney then advised the court that mother had "no problem" with a mutual and reciprocal order allowing both parents to practice their religion and teach the child their religious values during their parenting time. Mother also did not object to an order providing that "no one disparages the other party's religion," but she objected to an order providing that if she did not agree to support the child's Catholic faith, including taking him to Catholic events during her parenting time, she would be prohibited from taking him to a Protestant church.

The court considered the factors set forth in § 14–10–124(1.5)(b) and found "no credible evidence of the ability of the parties to cooperate and to make decisions jointly as to the religious upbringing of the child," and that it was in the best interests of the child for father to be solely responsible for decision-making about the child's religious upbringing. Accordingly, the court allocated responsibility to father. It further found that the recommendations in the special advocate's report, set forth above, for religious upbringing were in the child's best interests and ordered the parties to follow them. The court did not clarify any of those recommendations.

Quoting *In re Marriage of Short, supra*, 698 P.2d at 1313, the court stated that in making its findings, it had "consider[ed] no evidence as to the religious beliefs or practices of the parties, as there was no showing that such beliefs or practices 'are reasonably likely to [cause] present or future harm to the physical or mental development of the child.'" The court did not make any other finding concerning harm to the child in this portion of its permanent orders. However, during the special advocate's testimony, the court stated it intended to find that "indoctrination of the child contrary to [his] participation in religious services, of any kind, endangers the child."

### a. Sole Decision-making

■ We reject mother's contention that the court erred in allocating sole decision-making responsibility regarding the child's religious upbringing to father, despite the absence of evidence that mother's religious practices were harmful to the child.

As discussed in Part II, § 14–10–124(1.5)(b)(I) provides that one of the factors to be considered by the court in allocating decision-making responsibilities is the ability of the parties to cooperate and make decisions jointly. The record supports the court's findings that the parties could neither cooperate nor make decisions jointly, that mother had demonstrated a lack of respect for father's religious choices, and that because father was supportive of mother, her input to the child's religious upbringing

would enrich and broaden the child's experience, while his input was positive as well.

In allocating to father sole decision-making regarding the child's religious upbringing, the court expanded one parent's right to the care, custody, and control of a child at the expense of the other parent's similar right. But as a matter of law, this allocation does not alone deny mother's additional First Amendment rights to influence the child's religious upbringing during her parenting time or to exercise her own religious beliefs. *See e.g., Zummo v. Zummo, supra.* Hence, we discern no need to remand for further findings concerning a compelling state interest in the form of avoiding substantial physical or emotional harm to the child arising from shared decision-making. Instead, we conclude that in allocating sole religious decision-making to father, the court properly treated "the best interests of the child [as] of primary importance," and considered that "both parents share equally the burden of demonstrating how the child's best interests will be served." *In re Marriage of Ciesluk, supra,* 113 P.3d at 146–47.

### b. Giving the Child "Mixed Messages"

The special advocate's report recommended that the child not be given "mixed messages" by either parent about his religion. Because the term "mixed messages" is not defined in either the report or the court's order adopting this recommendation, we conclude that further findings are required.

This phrase could prohibit only disparagement of the other parent's religion, or it could more broadly limit any action by either parent that is not supportive of the other's religion or the child's participation in that religion, such as restricting exposure to that parent's own religious beliefs and practices. Because mother did not object to a mutual and reciprocal nondisparagement order, the constitutionality of the narrower interpretation of the order is not before us.

But if on remand the court clarifies that it intended to restrict a broader range of religious behavior, then the court must specify exactly what is prohibited and make further findings adequate to establish that a compelling state interest warrants such restrictions. *See In Interest of E.L.M.C., supra.*

### c. Taking the Child to Catholic Religious Activities

The special advocate's report also recommended that responsibility for taking the child to religious education classes or similar activities arising from father's choice of Catholicism should be assumed by the parent caring for the child when the activity occurs, unless the parents mutually agree otherwise. The special advocate did not explain whether "taking" the child to Catholic activities would require mother to accompany him into such activities, nor did the court do so in adopting this recommendation. The record does not indicate the frequency of such activities during mother's parenting time, any flexibility in rescheduling those activities outside of her parenting time, or the consequences to the child of missing some or all of them. Hence, we conclude that further findings are required.

This recommendation would clearly impinge on mother's religious freedom if on remand the court interprets it as requiring her to accompany the child to Catholic religious activities scheduled during her parenting time. *See Brown v. Szakal,* 212 N.J.Super. 136, 514 A.2d 81 (1986)(absent evidence of harm to the children, non-Jewish father could not be required to enforce Jewish dietary laws during his parenting time); *Johns v. Johns,* 53 Ark.App. 90, 918 S.W.2d 728 (1996)(dissenting opinion); *see generally Bowen v. Roy,* 476 U.S. 693, 704, 106 S.Ct. 2147, 2155, 90 L.Ed.2d 735 (1986)("In cases upholding First Amendment challenges, on the other hand, the Court has often relied on the showing that compulsion of certain activity with religious significance was involved.").

But if the court clarifies that mother is only required to make transportation arrangements during her parenting time, we note that other courts have discerned no constitutional violation because such a requirement merely accommodates the custodial parent. *See In re Marriage of Tisckos,* 161 Ill.App.3d 302, 112 Ill.Dec. 860, 514 N.E.2d 523 (1987); *Zummo v. Zummo, supra.* Those opinions do not discuss the pos-

sibility that a parent's particular religion may prohibit that parent from transporting a child to activities of a different religion, chosen by the other parent, and here mother presented no such evidence.

Further, the court made no findings indicating that it had considered less restrictive means of addressing the problem, such as rescheduling the activities to occur during father's parenting time, requiring that father provide the necessary transportation during mother's parenting time, or affording mother additional parenting time to compensate for any significant interruption to her parenting time. *See Zummo v. Zummo, supra.* These alternatives might also avoid a dispute over unreasonably burdening mother's parenting time. *See Johnson v. Nation,* 615 N.E.2d 141, 149 (Ind.Ct.App.1993)(decision-making parent could not require other parent to take child to "any and all activities Father deemed 'religious' during Mother's visitation time").

Nor did the court address consequences to the child of reducing or eliminating his participation in Catholic activities during mother's parenting time. *See Wagner v. Wagner,* 165 N.J.Super. 553, 557, 398 A.2d 918, 921 (1979)(Conflict with the rights of the nondecision-making parent can be avoided by recognizing that although the children may receive "less than ideal religious instruction," the deficiency may be overcome "if the children desire it when they become more mature.").

Hence, on this record, we cannot determine the extent of the burden, if any, from this recommendation on mother's religious freedom or whether any such burden is justified. And for this reason, we need not now decide whether merely requiring mother to transport the child to some Catholic activities during her parenting time would be either unconstitutional or unreasonable.

### d. Taking the Child to Mother's Church

■ The special advocate's report further recommended that mother be allowed to continue to take the child to her church during her parenting time, but "only so long as she supports [the child's] participation and attendance at church with father as well." Again, the report did not explain what support was required of mother, nor did the court do so in adopting this recommendation. Nevertheless, we conclude that this recommendation violates mother's First Amendment right to influence the child's religious upbringing by taking the child to her church, because the court found the child suffered no substantial physical or emotional harm from attending either parent's church. Therefore, it cannot stand.

Here, the special advocate testified that this restriction was intended only to give the court "a way to impose consequences [on mother's] unwillingness to recognize the child's faith." But she did not identify, and the court did not find, any harm to the child from attending mother's church. And the record contains neither evidence nor findings that the religions of mother and father are totally irreconcilable.

We are aware of no legal authority, and the parties have cited none, holding that the court may deprive mother of her constitutional right to take her child to her church for any reason other than substantial physical or emotional harm to the child from attendance at that church.

Accordingly, we conclude that this portion of the order unconstitutionally restricts mother's religious rights.

In sum, on remand the court should first determine whether any aspect of the parental conflict over the child's religious upbringing has exposed, or likely will expose, the child to substantial physical or emotional harm, sufficient to create a compelling state interest in protecting him from such harm. If so, the court should then determine whether the means chosen to protect the child from such harm are the least restrictive possible. If the court concludes that the existing record is not sufficient to make such additional findings, or if the court determines that a new hearing is desirable because of the passage of time since the permanent orders hearing, the court may elect to hold a new hearing. *See In Interest of E.L.M.C., supra.*

### C. Constitutionality of § 14–10–101, et seq.

Mother contends § 14–10–101, et seq., is unconstitutional to the extent that it permitted the trial court to restrict or prohibit her

from providing religious education to the child unless she also transports the child to be educated in father's religious faith during her own parenting time. Because we have held a portion of the permanent orders unconstitutional, and have remanded the remainder for findings on a compelling state interest, we need not address this contention.

### D. Evidence of Religious Practices

Mother contends the trial court erred in admitting evidence of religious practices that did not endanger the child. We address this issue because it may arise on remand, but reject mother's contention.

■ A court may not properly inquire into or make judgments regarding "the abstract wisdom of a particular religious value or belief" in allocating parental responsibilities. Therefore, evidence of religious beliefs or practices is admissible only as reasonably related to potential mental or physical harm to a child. *In re Marriage of Short, supra,* 698 P.2d at 1313. While such evidence may not be based upon mere conjecture, it need not be restricted to actual, present harm or impairment. *In re Marriage of Short, supra.*

Mother has not directed our attention to any instance in which the court inquired into, or admitted evidence concerning, the "abstract wisdom" of any "particular religious value or belief" of either party. Rather, she complains the court admitted evidence regarding matters such as the parties' agreement to baptize the child in the Catholic faith and the parties' efforts to incorporate religion into the child's life.

Decision-making responsibilities regarding religious training may be shared between the parents or allocated to one of them, based on the best interests of the child. Section 14–10–124(1.5)(b). The evidence admitted by the court concerns the parties' history of agreement or disagreement regarding the child's religious training, their efforts to incorporate religion into his life, and the potential effect of one party's disparagement of the other's religion. We conclude that these are factors which the court could properly take into account in considering whether the parties should share decision-making regarding the child's religious training and, if not, which one of them should make such decisions.

Accordingly, we perceive no evidentiary error.

### IV. Written Ruling

Mother contends the trial court erred and violated her due process rights by issuing a written ruling contrary to its oral ruling regarding the parties' rights to inculcate the child in the religious faith of their choice. We disagree.

Initially, we are not persuaded that the court's written ruling was inconsistent with its oral comments. The court indicated during the hearing that its order would be that "the parents shall not interfere with the child's religious practices." The written order provided that "both parties have the right to inculcate spiritual principles in the child," although they must follow the special advocate's recommendations in their religious upbringing of the child.

■ In any event, the court could modify its oral findings or orders at any time before issuing a final written order. *See In re Marriage of West,* 94 P.3d 1248 (Colo.App. 2004). Thus, to the extent that the written order differs from the court's statements during the hearing, the court acted within its authority.

■ Contrary to mother's assertion, the law of the case doctrine does not preclude changes that the court chose to make because its oral findings and orders were not final. *See DeForrest v. City of Cherry Hills Village, supra* (the law of the case doctrine discourages reconsideration only of the ruling itself, not of a court's preliminary opinion on questions of fact or law related to the ruling); *Colo. State Bd. of Med. Exam'rs v. McCroskey,* 940 P.2d 1044 (Colo.App. 1996)(the law of the case doctrine applies to final decisions that affect the same parties in the same case).

Hence, we discern no inconsistencies between the court's written order and its earlier statements that would require reversal.

## V. Submission of Affidavit with Closing Argument

 Mother contends the trial court abused its discretion in denying her motion to submit her affidavit with her written closing argument to contravene alleged misinformation from the special advocate. We do not agree.

A trial court may in its discretion permit a party who has rested to reopen a case for the purpose of presenting further evidence. *Rocky Mountain Animal Def. v. Colo. Div. of Wildlife*, 100 P.3d 508 (Colo.App.2004). A court's interest in administrative efficiency does not take precedence over a party's right to due process, which includes the right to cross-examine and to present evidence. *In re Marriage of Goellner*, 770 P.2d 1387 (Colo. App.1989).

Here, after the hearing on allocation of parental responsibilities ended, mother sought leave to file an affidavit to address "factual misperceptions and logical problems" in the report of the special advocate. She argued that because the parties had been given only about one half-hour to testify during the hearing, and because she had not been able to present her case through an expert or third-party professional, the interests of justice required that the court accept her affidavit.

The court denied the motion, finding that mother had been afforded ample opportunity to cross-examine the special advocate at trial, that she had fully cross-examined the special advocate, and that she had addressed alleged misperceptions and problems in the special advocate's report during her closing argument. The court also found that mother had neither sought a continuance to secure an expert witness nor requested additional time to accommodate her witnesses, and that reopening the evidence to take further testimony from a party by affidavit would be unjust. It ruled that, unless such evidence was materially new or different from what had been presented, the delay necessitated by another hearing would not be in the best interests of the child.

We conclude that the court's denial of the motion to file an affidavit was not an abuse of discretion.

## VI. Delegation of Arbitration Authority to Mediator

Mother contends the trial court erred in delegating arbitration authority to a mediator to be selected and used by the parties to resolve disputes involving the child. We do not agree.

Under § 14–10–128.5, C.R.S.2005, with the consent of all parties, the court may appoint an arbitrator to resolve disputes between them concerning their children.

Here, the court ordered that, in the event the parties could not resolve a conflict between them, they should refer the conflict to a mediator to be selected by them. The court further ordered that if the parties were unable to reach an agreement in mediation, the mediator "shall have arbitration powers" pursuant to § 14–10–128.5. But the court did not expressly order arbitration if mediation failed.

Mother argues that this provision of the permanent orders impermissibly delegates decision-making authority to an arbitrator without the parties' consent, in violation of § 14–10–128.5. Father responds that the court intended to authorize arbitration "pursuant to" § 14–10–128.5, thus incorporating all the requirements set forth in the statute, including the requirement that the consent of the parties be obtained before arbitration may take place.

We conclude that this provision of the permanent orders is ambiguous as to whether the court intended to require the parties to arbitrate their disputes if mediation failed, or merely intended to make arbitration readily available to them. The language of an ambiguous decree should be accorded a reasonable and sensible meaning, consonant with its dominant purpose. *In re Marriage of Connell*, 831 P.2d 913 (Colo.App.1992).

We further conclude that the court intended only to provide the option of resolving future disputes through arbitration, and to allow the mediator selected by the parties to arbitrate the dispute if they agreed to pro-

ceed to arbitration using the mediator. Hence, the order does not violate § 14–10–128.5.

## VII. Parenting Time Order

Mother contends the trial court abused its discretion in entering a parenting time order contrary to the recommendations of the child's therapist. We disagree.

Only facts appearing in the record can be reviewed, and an appellate court presumes that material portions omitted from the record would support the judgment of the trial court. *In re Marriage of Tagen*, 62 P.3d 1092 (Colo.App.2002). Argument of counsel is not evidence and does not substitute for a proper appellate record. *In re Marriage of Beckman*, 800 P.2d 1376 (Colo. App.1990).

Here, the transcript of the therapist's testimony is not available, and mother failed to prepare a statement of the missing testimony under C.A.R. 10(c). In the absence of a transcript of the therapist's testimony or a statement of the evidence presented by her, we must presume that the therapist's testimony would support the court's order.

## VIII. Motion to Disqualify the Court

Mother finally contends the trial court abused its discretion in denying her C.R.C.P. 97 motion to disqualify itself. She further contends that, "if implied in the February 12, 2004 order," the trial court's statement during the hearing that "indoctrination of the minor child contrary to his participation in religious services endangers the child" is additional evidence of the trial court's "bent of mind" and of an unconstitutional preference for religion. We disagree.

C.R.C.P. 97 requires a trial judge to accept affidavits filed with a motion to disqualify as true, even though the judge believes that either the statements contained in the affidavits are false or the meaning attributed to them by the party seeking disqualification is erroneous. If facts have been set forth that create a reasonable inference of a "bent of mind" which will prevent the judge from dealing fairly with the party seeking disqualification, the judge must recuse.

To sustain a motion under C.R.C.P. 97, however, the allegations in the affidavits may not be based on "mere suspicion, surmise, speculation, rationalization, conjecture, [or] innuendo," nor can they be "statements of mere conclusions of the pleader." *In re Marriage of Goellner, supra,* 770 P.2d at 1390 (quoting *Johnson·v. Dist. Court,* 674 P.2d 952, 956 (Colo.1984)). Adverse rulings, standing alone, do not constitute grounds for recusal. *In re Marriage of Johnson,* 40 Colo.App. 250, 576 P.2d 188 (1977). Whether to recuse is a matter within the discretion of the trial court, and its ruling will not be disturbed on appeal except for an abuse of discretion. *In re Marriage of Mann,* 655 P.2d 814 (Colo.1982).

In her verified motion, mother stated that the judge, like father and the special advocate, is Catholic; that the judge had "consistently and explicitly invoked God's blessing" during the litigation; that in the permanent orders, he had cited excerpts from the special advocate's report regarding the Catholic faith; and that he adopted the special advocate's recommendation that father should be granted decision-making responsibility regarding the child's religious upbringing.

Mother argued that the judge's religious faith had caused him to have a bent of mind which deprived her of a fair trial. She pointed to his rulings admitting evidence of the parties' religious practices, his acceptance of the special advocate's opinions as facts despite alleged bias of the special advocate, and his written ruling limiting mother's right to take the child to her church, which allegedly conflicted with his earlier oral ruling on the same subject, as discussed in Part IV.

Assuming, without deciding, that mother's verified motion meets the C.R.C.P. 97 requirement of· establishing facts warranting disqualification by affidavit, the only facts established by her motion are the judge's religious affiliation and his ending status conferences with "God bless." Otherwise, mother's motion raises only rulings adverse to her, which as a matter of law do not establish grounds to disqualify the trial court judge. *See In re Marriage of Johnson, supra.*

We disagree that the judge's faith is sufficient to support a "reasonable inference" that

he was biased against mother or that he had a bent of mind which resulted in rulings adverse to her. Courts in other jurisdictions have consistently held that a judge's particular religious affiliation does not create sufficient appearance of bias to require recusal. *See Bryce v. Episcopal Church,* 289 F.3d 648 (10th Cir.2002)(citing cases). We agree with these cases and reach the same conclusion here.

We also disagree that the court's use of the phrase "God bless" at the conclusion of status conferences is evidence of bias. A judge's use of religious phrases in court should be avoided and could be problematic in a dispute between a parent holding sectarian beliefs and a parent who is agnostic or atheist. But here use of the phrase does not suggest that the court was biased in favor of father's church or against mother's church.

Accordingly, we conclude that the trial court did not abuse its discretion in declining to recuse.

The permanent orders relating to the allocation of parental responsibilities are reversed with respect to the court's adoption of the special advocate's recommendation that mother could be denied the right to take the child to her own church if she fails to support the child's participation and attendance at Catholic activities chosen by father. The permanent orders are vacated with respect to the parties' obligation to follow the remaining recommendations set forth in the special advocate's report for the religious upbringing of the child. The case is remanded for additional findings regarding limitations on mother's religious freedom, the existence of a compelling state interest justifying any such limitations, and the restrictiveness of the means chosen to protect such an interest. The permanent orders relating to the allocation of parental responsibilities are affirmed in all other respects, as are the orders denying mother's C.R.C.P. 59 and 60 motion and her C.R.C.P. 97 motion.

RUSSEL and HAWTHORNE, JJ., concur.